IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FLI DEEP MARINE LLC, BRESSNER   :
PARTNERS LTD., LOGAN LANGBERG   :
AND HARLEY LANGBERG            :
                               :
            Plaintiffs,        :
                               :
         vs.                   :   Civil Action
                               :   No. 5020-VCS
PAUL McKIM, B.J. THOMAS,        :
DANIEL ERIKSON, FRANCIS WADE    :
ABADIE, OTTO CANDIES, JR.,      :
OTTO CANDIES, III, EUGENE       :
DePALMA, LARRY LENIG, JOHN      :
ELLINGBOE, BRUCE GILMAN, JOHN   :
HUDGENS, NASSER KAZEMINY, DCC   :
VENTURES, LLC, NJK HOLDINGS     :
CORPORATION, NKOC, INC., OTTO   :
CANDIES, LLC, DEEP MARINE       :
HOLDINGS, INC., AND DEEP        :
MARINE TECHNOLOGY, INC.,        :
                               :
            Defendants.        :

                    -  -  -

                    Chancery Court Chambers
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Monday, November 2, 2009
                    10:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

                OFFICE CONFERENCE


--------------------------------------------------------

            CHANCERY COURT REPORTERS
        500 North King Street - Suite 11400
         Wilmington, Delaware 19801-3759
                (302) 255-0525

2

```
 1    APPEARANCES:

 2              LAURIE SCHENKER POLLECK, ESQ.
              Jaspan Schlesinger LLP
 3                   -and-
              MICHAEL A. LEON, ESQ.
 4            of the New York Bar
              Jaspan Schlesinger LLP
 5                   -and-
              KATHERINE B. HARRISON, ESQ.
 6            JASON J. SNYDER, ESQ.
              of the New York Bar
 7            Paduano & Weintraub LLP
                 For Plaintiffs FLI Deep Marine LLC,
 8               Bressner Partners Ltd.,
                 Logan Langberg and Harley Langberg

 9

10              PATRICIA L. ENERIO, ESQ.
              Proctor Heyman LLP
11               For Defendant Paul McKim

12              RICK S. MILLER, ESQ. (via telephone)
              Ferry, Joseph & Pearce, P.A.
13               For Defendant B.J. Thomas

14              MICHAEL J. MAIMONE, ESQ.
              JOSEPH CICERO, ESQ.
15            Greenberg Traurig, LLP
                 For Defendants Deep Marine Holdings, Inc.
16               and Deep Marine Technology, Inc.

17              DENISE SEASTONE KRAFT, ESQ.
              TYLER O'CONNELL, ESQ.
18            Edwards Angell Palmer & Dodge LLP
                 For DeepWork, Inc.
19

              FRANCES GAUTHIER, ESQ.
20            Stradley Ronon Stevens & Young, LLP
                     -and-
21            KEVIN W. GOLDSTEIN, ESQ.
              of the Pennsylvania Bar
22            Stradley Ronon Stevens & Young, LLP
                 For Otto Candies, Jr., Otto Candies, III
23
                                   (Cont'd)
24
```

CHANCERY COURT REPORTERS

```
 1   APPEARANCES: (Cont'd)

 2           TODD C. SCHILTZ, ESQ.
             Drinker Biddle & Reath LLP
 3             For Defendants Bruce Gilman, Larry Lenig
               and Francis Wade Abadie
 4
             DAVID S. EAGLE, ESQ.
 5           Klehr, Harrison, Harvey, Branzburg &
             Ellers LLP
 6             For Defendants Daniel Erikson,
               Eugene DePalma, John Hudgens,
 7             Nasser Kazeminy, DCC Ventures, LlC and
               NJK Holdings Corporation
 8
 9                       -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

CHANCERY COURT REPORTERS

4

1            THE COURT:  Good morning, everyone.

2   You may proceed.

3            MS. HARRISON:  Good morning, Your

4   Honor.  Kate Harrison from Paduano & Weintraub,

5   counsel to FLI Deep Marine LLC, Bressner Partners,

6   Ltd., and the Langbergs, former minority shareholders

7   of approximately 5 percent of Deep Marine Holdings,

8   Inc., and its wholly owned subsidiaries Deep Marine

9   Technology, which we call together DMT.

10            Plaintiffs were most recently squeezed

11   out of DMT in a Delaware short-form merger.  The

12   defendants are DMT, the controlling shareholders and

13   their entities, the current and former officers and

14   directors who have systematically stripped plaintiff

15   of their entire $1.75 million investment and their

16   legal rights to complain or even inquire about what

17   happened to the company they invested in.

18            Plaintiff invested approximately

19   $1.75 million in 2002 in a startup company to provide

20   subsea services in the oil and gas industry --

21   offshore, mainly, Gulf of Mexico.

22            THE COURT:  I've read everything.

23   We're at a scheduling conference.

24            What is it you're seeking to enjoin?

CHANCERY COURT REPORTERS

1              MS. HARRISON:  We want to make sure

2      that what remains of the assets of DMT are not taken

3      out of the jurisdiction so that we are left with

4      absolutely no remedy.

5              We fear that DMT and these defendants

6      are right now in the middle of selling the last few

7      valuable assets -- the vessels -- and that they may be

8      selling them under market value and that the proceeds

9      will disappear.  So we seek to -- we seek to enjoin

10     only sales out of the ordinary course, and we just ask

11     that the proceeds be held in escrow and we seek

12     expedited discovery.

13              THE COURT:  Okay.

14              MR. MAIMONE:  Your Honor, Mike Maimone

15     for Deep Marine Holdings and Deep Marine Technology.

16              What plaintiffs are seeking here is,

17     in my view, unusual.  I don't -- we view this as a

18     statutory appraisal action.  We think all the issues

19     that are set forth in the complaint should be dealt

20     with in the appraisal action.  I think the Glassman

21     decision in the Supreme Court holds that.

22              Actually, the fiduciary duty claims

23     are probably subject to a motion to dismiss by my

24     friends on the defendants' side, since I represent the

CHANCERY COURT REPORTERS

6

1   company, the company has no fiduciary duty.  But in

2   connection with the current application, plaintiffs

3   base their application on pure speculation.  Deep

4   Marine is an operating company.  I was told by Deep

5   Marine that there's no plans to liquidate.  There's no

6   plans to dissolve.  They're merely trying to raise

7   cash to keep the operations going.

8              The plaintiffs, as a form of

9   stockholders, have taken the status as creditors.  In

10  the Alabama By-Products decision, the Supreme Court

11  held that if you perfect your appraisal rights --

12  we're not conceding that everyone perfected their

13  appraisal rights -- but to the extent that any of the

14  plaintiffs perfected their appraisal rights, they're

15  creditors of the company and we believe they have full

16  rights of creditors.  They have the fraudulent

17  conveyance laws to protect them -- 174 to protect

18  them.  They have all the relief that the Court of

19  Chancery recognized in North American Catholic to

20  protect them.

21             So we don't really see the reason to

22  enter a TRO because Deep -- there's no -- based in the

23  complaint or any of the papers tendered, a TRO -- Deep

24  Marine is an operating company.  It's going forward.

CHANCERY COURT REPORTERS

1    If that changes, then plaintiffs can enforce their

2    rights at that time.  Right now, plaintiffs haven't a

3    ripeness argument because nothing is happening.

4    Plaintiffs are dealing with speculation because they

5    don't know anything and there's nothing really to

6    know.  This is a damages action, where we can just

7    move forward in the ordinary course.  My friends on

8    the defendants' side could file whatever motions they

9    deem appropriate in connection with a motion to

10   dismiss.  The company will deal with the appraisal

11   action appropriately, and we can just move forward

12   with the appraisal action and whatever motion practice

13   my friends feel --

14                THE COURT:  When the appraisal notice

15   was given, was the special committee report disclosed?

16                MR. MAIMONE:  My understanding is it

17   was not.

18                MS. HARRISON:  As you can tell from

19   the chronology of the case, the company announced that

20   the committee had reached its conclusion.  It did not

21   give anybody the report, and the very next day it

22   announced the short-form merger.  So it thereby ruined

23   our standing to continue the derivative action the

24   very next day.  So we find the timing of that highly

8

1   suspicious.  I think, when Vice Chancellor Noble

2   dismissed our derivative action without prejudice, he

3   assumed that we would be back.

4                THE COURT:  Did no one get Mr. Miller

5   on the phone?

6                He is on the line.

7                Okay.  Here's what we're going to do,

8   folks.  I'm not setting up any kind of injunction

9   schedule.  I don't know what we would enjoin.  On the

10  other hand, I am granting expedited discovery.  I'm

11  not exactly clear -- off the record.

12                (Discussion off the record.)

13                THE COURT:  Back on the record.  This

14  is a little wacky situation.  I don't want -- I will

15  tell the defendants -- individual defendants -- don't

16  be looking for me to be sympathetic to motions to stay

17  discovery.  Discovery is not going to be stayed.  I'm

18  allowing expedited discovery because, frankly, this is

19  a record that creates a situation that -- at least a

20  colorable perception that people are horsing around.

21  I mean, the moving papers, with all fairness to the

22  defendants, telling me that they somehow got

23  vindicated in the derivative action, that's not what

24  happened at all.  That is not what Vice Chancellor

CHANCERY COURT REPORTERS

9

1   Noble's decision says.  What it says is people goofed

2   up.  It's not the first time I've seen people goof up

3   like this.  Folks who don't consult with Delaware

4   lawyers early on in a process sometimes, when they

5   make a demand, they go, "Oops."  But the point is,

6   there's basis under the law to challenge even a

7   special committee's investigation.  But you have to

8   wait until it's done.

9              As I understand what the defendants

10  did before Vice Chancellor Noble is say, "Look, the

11  law's the law."  They goofed up.  I believe

12  Vice Chancellor Noble indicated some doubts about the

13  independence of the committee.  He let the process go

14  forward.  Frankly, the defendants made arguments about

15  the amount of time they needed.  It's not clear to me.

16  You can all shed light on this later on whether the

17  defendants were forthcoming about when they were

18  planning the merger, whether they were at all planning

19  a merger during the pendency of the suit before

20  Vice Chancellor Noble, whether they let anyone know

21  about it.  Very interesting circumstances.

22             It may well be that all of these

23  things can be litigated purely in the context of the

24  appraisal.  But the reality is, that's why discovery

CHANCERY COURT REPORTERS

1    should go forward because, if the defendants' --

2    individual defendants' -- argument is it all got

3    bought into the respondent, but you have to value all

4    these claims in the appraisal, well, then, the

5    discovery should go forward because it's essentially a

6    merits discovery.  It's going to be relevant to value.

7                I also think there is some concern

8    about the respondent and the ability of the respondent

9    to answer these claims.  You know, it would be a much

10   more edifying record, if somebody wants to put out an

11   appraisal notice with the actual report, if there is

12   such a report.  Who knows at this point?  What there

13   was some sort of exculpatory release apparently

14   saying, you know, nothing happened that was actionable

15   and there's a short-form merger and I think people got

16   offered pennies.

17                MS. HARRISON:  One penny a share.

18                THE COURT:  A penny a share.

19                So, it's a rather odd circumstance.  I

20   have read Glassman.  I'm very familiar with the 253

21   jurisprudence.  I don't know what the exception is for

22   fraud, other sorts of things.  But I won't rule out at

23   this stage the following possibility.  There's a

24   derivative action pending.  Folks made a procedural

1    goof-up by making a demand.  A special committee is

2    formed in order to delay, doesn't really do a

3    professional job or an independent job, issues a

4    report which -- to somebody, but not to any of the

5    people who brought the derivative claims.  And while

6    it gets the case dismissed on the grounds of delay,

7    that we need to investigate this and, immediately upon

8    concluding this thing, a short-form merger is done to

9    excuse -- to essentially wipe out the claim.  We do

10   know that there is jurisprudence that says, when a

11   merger is done specifically for the purpose of getting

12   rid of claims, that that doesn't really get rid of the

13   claims.  If there's ever a circumstance again where

14   people have played themselves into a perception, I

15   could not on a motion to dismiss rule out the

16   inference that these folks wanted to get rid of these

17   claims and did a short-form merger.  You know, mergers

18   are powerful things.  They're not just thought of

19   instantaneously.  This one was done fairly shortly

20   after Vice Chancellor Noble considered a motion to

21   dismiss and granted it.

22                 So what I would also urge on the

23   plaintiffs' side -- and I think I get into the

24   Delaware law.  There's really no need.  We're seeing

CHANCERY COURT REPORTERS

1    this more and more in the Court.  7 million counts.  I

2    mean, I'm not saying -- you know, aiding and abetting

3    against the officer and director defendants.  If

4    you're an officer and director, there's a term for

5    when you aid and abet a breach of fiduciary duty.

6    It's called a breach of fiduciary duty.  It's

7    not -- we don't have like everybody is guilty of a

8    breach of fiduciary duty, plus because they did it in

9    concert with their fellows in aiding and abetting

10   claim.

11                   I don't know what this fraud through

12   concealment is.  How is that different from breach of

13   fiduciary duty?  Fraud through silence in the face of

14   disclosure.  A claim against controlling shareholders

15   for wrongful equity dilution.  Claim against

16   controlling shareholder defendants for unjust

17   enrichment.  I don't know how that's different from

18   the third cause of action, which is claims against the

19   controlling shareholder for breaches of their

20   fiduciary duties.  It strikes me that, if they didn't

21   breach their fiduciary duties, there was no unjust

22   enrichment that, with respect to wrongful equity

23   dilution, what you're arguing is, there is a breach of

24   fiduciary duty and therefore these were self-dealing

CHANCERY COURT REPORTERS

1    transactions that wrongfully diluted folks because the

2    transactions were improperly priced or motivated.

3    These are not really separate causes of action.

4                      Accounting.  Accounting is a remedy.

5    You can put that in the wherefore clause, I believe.

6    You can say, wherefore because there have been

7    breaches of fiduciary duty, we need to get to the

8    bottom of this.  There ought to be an accounting.  All

9    I'm saying is, you're going to get expedited

10   discovery.  I would urge on the cost sides of this --

11   I don't know how big this company is or what it is.

12   All I do know is two, four, six, eight, ten, 12, 13,

13   plus Mr. Miller on the phone, 14 lawyers, let the

14   record reflect.  And I may have miscounted.  I'm not

15   that great at math.  Fourteen lawyers already.  This

16   is an expensive morning; right?  For the cost of this

17   morning, you could have doubled the consideration

18   given in the merger to the plaintiff.  Right?

19                      You know, only clients know what

20   really happened.  Obviously there are professors of

21   philosophy who would say even they don't actually know

22   what happens.  They have a perception of what

23   happened.  But my point is that, you know, one of the

24   things that our profession really has to do is, you

CHANCERY COURT REPORTERS

1    always have to take -- you want to be vigilant in

2    representing your clients, but you actually need to

3    challenge them and talk to them.  I don't know how

4    really valuable this is from the plaintiffs' side.  I

5    don't know if this was a business going down the

6    drain.  There's obviously the possibility, for

7    example, that these people did trivial -- even if you

8    accept the complaint as true -- did trivial

9    self-dealing transactions around the margins because

10   there was a political buddy.  But that, in the scheme

11   of the world, they don't add up to a lot of economic

12   value.

13              I mean, you know, is this case really

14   about Mr. -- former Senator and Mrs. Coleman?  If it's

15   a matter of that and some sort of principle, the case

16   might be settleable on that basis.  Give to the people

17   who were cashed out the maximum amounts allegedly

18   overpaid to Senator Coleman and Mrs. Coleman.  As I

19   get it -- I might be wrong -- but it wouldn't be

20   gazillions of dollars.  It might be nice for people

21   like around here who work for the state and yearly pay

22   cuts, we would like to have some supplement of 25,000,

23   or whatever it was a month, or $75,000.

24              But my point is that out of that does

1  not an appraisal case make.  These obviously -- these

2  things with boats, though, and other things, at first

3  I couldn't -- Mr. Candies' name got me distracted

4  because I was trying to figure out the synergies

5  between a maritime company and some sort of candy

6  company, until I realized this was just a person's

7  name.  It's like oh, there's Candies.  A venerable

8  chocolatier in Minneapolis.  Everybody at

9  Christmastime gives a box of Otto Candies to their

10 kids.

11             But what I'm saying, you have to size

12 up what you get out of this rather than you're just

13 angry.  I'm not saying that's what's motivating it.

14 You have to figure that out.

15             On the defendants' side, again, you

16 know, you can't represent your clients without doing a

17 reality check on what went on.  And sometimes things

18 that -- you know, sometimes things that look slick are

19 perfectly fine.  And when it's all said and done, it

20 all looks above board.  Obviously, when things that

21 are done are slick, they look slick.  The genuinely

22 slick don't look slick because they figure out ways

23 for it not to look, you know, so immediately

24 suspicious.  This is a situation where people managed.

1  Might have been the best thing in the end.  I don't

2  know.  But obviously was a course of events that

3  didn't look exactly edifying, particularly a

4  short-form merger like this where the economic

5  consideration given to the people being cashed out was

6  basically bupkis.

7                    So, before you get into discovery, you

8  may want to figure out where your respective positions

9  are.  What are the plaintiffs seeking out of this?  I

10 don't know how many stockholders there were in

11 general.  Obviously the investment -- is the

12 investment of all the cashed out people 1.7 million?

13                   MS. HARRISON:  No.  That's just our

14 clients.  There are a couple of other -- not very many

15 minority shareholders.  There are a couple of other

16 groups.

17                   THE COURT:  You don't know what their

18 percentage holdings were in comparison to your

19 clients?

20                   MS. HARRISON:  Well, at the end of it,

21 because of the short-form merger, they held

22 90 percent, we held 5 percent.

23                   THE COURT:  I'm just talking about

24 like in terms of cash in.  You're saying your clients

CHANCERY COURT REPORTERS

1    put in 1.7 million to get in?

2                    MS. HARRISON:  I don't know that.  But

3    I know there is a group -- there is another group of

4    minority shareholders --

5                    THE COURT:  Did they perfect appraisal

6    rates?

7                    MS. KRAFT:  DeepWork is here, Your

8    Honor, we filed a tag-along action and we did perfect

9    our rights, is our contention, and that was somewhere

10   in the vicinity of $800,000.  A little bit over a

11   million.  I'm still trying to figure that out.

12                   THE COURT:  So there's another action.

13   Have I gotten papers in chambers about that?

14                   MS. KRAFT:  They were sent over on

15   Friday.  My understanding -- and I spoke with counsel

16   for the FLI plaintiff earlier -- is that there are a

17   couple other minority shareholders.  This was not

18   filed as a class action.  That's another consideration

19   for amendment.  We haven't really spoken about that.

20                   THE COURT:  Well, I think one of the

21   things you ought to be talking about is coordinating

22   whether it's a class action or not.  Obviously it

23   would be better to have one complaint.  But between

24   your two groups, do we essentially have all the other

18

1   minority --

2                   MS. HARRISON:  I think a couple of the

3   defendants also have -- were minority shareholders.

4                   THE COURT:  I'm assuming they don't

5   care about that.

6                   MS. HARRISON:  Right.  But what I'm

7   saying is, I think it's a very small universe of

8   minority shareholders.

9                   MS. KRAFT:  We're thinking maybe about

10  a group of five or six.  Would that be correct?

11                  MS. HARRISON:  Yeah, at most.

12                  THE COURT:  Five or six, in addition

13  to your groups?

14                  MS. HARRISON:  No, I think it might be

15  DeepWork and maybe one other group only.

16                  THE COURT:  Is Mr. McKim part of one

17  of these groups?

18                  MS. HARRISON:  Mr. McKim is a

19  defendant.

20                  THE COURT:  I understand that.  I get

21  that he's a defendant.  Your papers didn't seem

22  particularly hostile toward him.

23                  MS. HARRISON:  Well, because we

24  believe he was a whistleblower, in a sense.

CHANCERY COURT REPORTERS

19

1          THE COURT:  Right.

2          What I'm trying to talk about here

3    is -- in a room where we got -- what did we say? --we

4    counted up with Mr. Miller, 15 or 14 lawyers -- is, as

5    we go forward, there will be material amounts of money

6    spent.

7          MS. HARRISON:  Absolutely right.

8          THE COURT:  All I'm saying is,

9    sometimes what people want -- you know, they don't

10   want to be suckers -- is sometimes, if you focus early

11   on what's at stake, what the costs of enforcement are

12   and all that kind of good stuff, you know, it may be

13   like everybody gives their clients litigation budgets

14   and all that kind of stuff.  That before you go spend

15   hundreds of thousands of dollars, as you will in

16   discovery, no doubt, that you begin to think about,

17   you know, what it is.  Sometimes people's investments

18   in -- "Like I at least want my money back and I think

19   these people are jerks and I will never invest with

20   them again.  If I can at least get the skin that I put

21   in the game back or something like it, then I'm

22   willing to move on because I'm realistic about the

23   world."  You know, I don't know.  I don't know what

24   that would mean in terms of the defendants.  I don't

CHANCERY COURT REPORTERS

1   know any of it.

2               I do know, as professionals, if you're

3   representing people who are being rational, now is the

4   time, rather than later, to think about it.  What I'm

5   saying to the defendants is, this is not a surgical

6   case.  This is not one you're going to come in and say

7   this is a really neat, tidy record.  We had

8   Warren Buffett and Bill Gates as the special

9   committee, advised by counsel for religious elders and

10  ethics professors, and therefore, you know, you just

11  get rid of it early.  It's just not going to be that

12  way.  It may over time bear up.  But it bears up

13  after, you know, that wonderful thing we call

14  discovery.

15              And after the discovery happens,

16  people writing briefs and all that kind of stuff,

17  which, again, I don't know how people keep that in the

18  five figures.  Since you all -- you are going to have

19  those costs, too.  Fee shifting is not prevalent in

20  the U.S.  I don't know what these things are worth in

21  the current market.  So take that to heart.  I don't

22  need to set a schedule at this point.  You need to

23  talk about getting discovery going.

24              What I would suggest would be

21

1   rational, if you're not going to get it settled, would

2   be that you focus on getting some document discovery

3   done first, then perhaps getting the plaintiffs to --

4   the multiple plaintiffs to coordinate and file an

5   amended pleading that everybody takes a shot at.

6                    MS. HARRISON:  Your Honor, this is a

7   difficult group of lawyers.  I've had already

8   difficult experiences with this group.  If I could ask

9   you to set some kind of a schedule, also.  We need it.

10  That's one reason I'm here.

11                   THE COURT:  What I would tell to the

12  defendants, this is going to be sort of

13  self-enforcing.  You're going to have claims holding

14  over your head until you get the document discovery

15  done.

16                   You know, it's going to be pretty

17  simple.  You know, they're going to want to get rid of

18  the claims.  Well, you're shaking your head.  I'm not

19  going to do this.  Look, they're in court now.  If

20  people horse around with this Court, this Court takes

21  care of them.  I've ordered the discovery to go

22  forward and it's going to go forward.  If people are

23  obstinate, they will -- you can file a motion.

24                   MS. HARRISON:  Thank you.

22

1          THE COURT:  I think everybody

2   understands.

3          I have no idea -- you said they're

4   difficult.  I don't know how difficult you've been,

5   not to say that you're not the most gracious,

6   wonderful person in the world.  I'm just not there.

7   Sometimes it's been my experience that -- on more than

8   one occasion -- that difficulties arise and no one is

9   exactly in the right.

10          What I'm saying is, you haven't made

11   any kind of record of that today.  You have not.

12          MS. HARRISON:  It's in my affidavit.

13          THE COURT:  What, that they didn't

14   give you documents?

15          MS. HARRISON:  It's in my affidavit

16   that my very first phone call with Nasser Kazeminy's

17   law firm is the man threatening me.  It's a very

18   difficult group of lawyers.  I've never experienced

19   that kind of difficulty in my life, and I've been

20   practicing for 20 years.  And I practice in

21   New York City where you think they're tough.  I have

22   not experienced this before.  And I really believe

23   that we need --

24          THE COURT:  Well, you're in Chancery

23

1    now.  I don't know who is representing -- I can't

2    pronounce his name at this point.

3                MR. EAGLE:  This is David Eagle.  I'm

4    representing Nasser Kazeminy.  I never met Miss

5    Harrison until this morning.  Never had a phone call

6    or e-mail.  We're in Delaware.  We're in Chancery

7    Court.  Everyone is going to work cooperatively.

8                THE COURT:  If you hear from somebody

9    who is not admitted pro hac about this case, then

10   bring it to the attention of the Court.  What you did

11   in -- before this case was filed -- again, I was not

12   the Judge.  I don't know if this was before in the

13   later case, or after the dismissal or whatever.  But I

14   have found that when people have to file pro hac and

15   get -- you know, face the music, all -- we do have

16   Delaware lawyers here and they're regularly

17   accountable to the Court.  And they're the ones -- the

18   people who are appearing here are the ones going to be

19   responsible for discovery.

20               I also expect -- I shouldn't have to

21   say this, but I've been astonished -- I expect that

22   the Delaware lawyers will be meaningful in discovery

23   and discovery is not left to clients.  People visit

24   offices, people find out where the documents are.

CHANCERY COURT REPORTERS

1   People don't tell clients, "Go through your hard drive

2   and find your e-mails."  That is not discovery.  That

3   was never appropriate discovery before e-mail.  It's

4   certainly not now.  You never told a client, "Oh, look

5   in your drawer.  Find all the good stuff and send it

6   to me."  Yeah.  Right.  I mean, that is not a

7   trustworthy way to do discovery.

8                   I'm also assuming, if there was a

9   special committee report, that a lot of the stuff is

10  compiled.

11                  MS. SCHENKER POLLECK:  Your Honor,

12  could you order a stipulated order for discovery or --

13                  THE COURT:  If you all -- the ones

14  getting close to the line now are on the plaintiffs'

15  side of the table.  Okay?  This is not take-out.  I'm

16  not taking your take-out menu.  I ordered expedited

17  discovery.  The first instance you sit down, you can

18  use the room here and you can talk to your colleagues.

19  The way we're going to do this is documents first.  I

20  said that.  I think I've been pretty clear.  You get

21  the documents from all the defendants.

22                  What I would then suggest is a period

23  of time for the plaintiff to put together an amended

24  pleading.  I'm not going to say whether expedited

CHANCERY COURT REPORTERS

25

1    discovery means they get the documents in ten days, 20

2    days or 30 days.  This is a claim for money.  Okay?

3    This is what this is about.  I'm also not going to

4    have two groups of plaintiffs acting in an

5    uncoordinated way.

6                    MS. KRAFT:  Your Honor, Denise Kraft.

7    I intend to fully coordinate.  We don't have the

8    ability to do that yet.  We will absolutely coordinate

9    this case.

10                   THE COURT:  Right.  Again, get --

11   think about your litigation budgets, think about early

12   on whether, you know, it makes sense to go forward or

13   whether you want to take a shot at resolving it early

14   because it's going to get expensive.  But that's the

15   structure.  I'm not going to sit here and tell you how

16   many minutes.

17                   You haven't even talked to the people

18   on the other side.

19                   Okay.  Thank you.

20                   (Conference adjourned at 10:35 a.m.)

21

22

23

24

CHANCERY COURT REPORTERS

26

1                           CERTIFICATE

2                   I, DIANE G. McGRELLIS, Official Court

3    Reporter of the Chancery Court, State of Delaware, do

4    hereby certify that the foregoing pages numbered 3

5    through 25 contain a true and correct transcription of

6    the proceedings as stenographically reported by me at

7    the hearing in the above cause before the Vice

8    Chancellor of the State of Delaware, on the date

9    therein indicated.

10                  IN WITNESS WHEREOF I have hereunto set

11   my hand at Wilmington, this 3rd day of November, 2009.

12

13                      /s/ Diane G. McGrellis
                    ----------------------------
14                  Official Court Reporter
                      of the Chancery Court
15                      State of Delaware

16

17   Certification Number: 108-PS
     Expiration:  Permanent
18

19

20

21

22

23

24

                    CHANCERY COURT REPORTERS