1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF TEXAS

3               HOUSTON DIVISION

4   DEEP MARINE HOLDINGS, INC.    §    CASE NO. 10-3026-H1-ADV
                                  §    HOUSTON, TEXAS
5   VERSUS                        §    THURSDAY,
                                  §    JANUARY 21, 2010
6   FLI DEEP MARINE, LLC          §    3:00 P.M. TO 4:13 P.M.

7

            TEMPORARY RESTRAINING ORDER HEARING
8
          BEFORE THE HONORABLE MARVIN ISGUR
9           UNITED STATES BANKRUPTCY JUDGE

10

11                     APPEARANCES:

12        FOR PLAINTIFF:      SEE NEXT PAGE

13        FOR DEFENDANT:      SEE NEXT PAGE

14        COURT RECORDER:     SUZANNE GUEVARA

15        COURT CLERK:        RISHONA SMITH

16

17

18

19

20                     PREPARED BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, INC.
                   P.O. Box 925675
22            Houston, Texas 77292-5675
          Tel: 281-328-6179 ▼ Fax: 281-462-2016
23            www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

1                          __APPEARANCES:__

2  FOR THE PLAINTIFFS/DEBTORS,
   DEEP MARINE HOLDINGS, INC.:   MARCY E. KURTZ, ESQ.
3                               JASON G. COHEN, ESQ.
                               BRACEWELL & GIULIANA, LLP
4                               711 LOUISIANA ST., STE 2300
                               HOUSTON, TX  77002
5                               713-221-1416

6
   FOR CREDITOR'S COMMITTEE:     PAUL MOAK, ESQ.
7                               MCKOOL SMITH
                               600 TRAVIS ST., SUITE 7000
8                               HOUSTON, TX  77002
                               713-485-7300
9

10                  APPEARING TELEPHONICALLY:

11 FOR THE DEFENDANT,
   FLI DEEP MARINE, LLC,
12 BRESSNER PARTNERS, LTD.,
   LOGAN AND HARLEY LANGBERG:   ANTHONY J. PADUANO, ESQ.
13                             JASON SNYDER, ESQ.
                             PADUANO WEINTRAUB, LLP
14                             1251 AVENUE OF THE AMERICAS
                             SUITE 920
15                             NEW YORK, NY  10020
                             212-785-9100
16

17 FOR NASSER KAZEMINY:          LISA GOLDEN, ESQ.
                               JASPAN SCHLESINGER LLC
18                             300 GARDEN CITY PLAZA, 5TH FL.
                             GARDEN CITY, NY  11530
19                             516-746-8000

20
   FOR OTTO CANDIES, LLC,
21 OTTO CANDIES, III,
   CANDIES SHIPBUILDERS, LLC:   KARL J. ZIMMERMAN, ESQ.
22                             BALDWIN HASPEL BURKE & MAYER
                             SUITE 2200 ENERGY CENTER
23                             1100 POYDRAS ST.
                             NEW ORLEANS, LA  70163
24                             504-569-2900

25

```
 1   FOR NASSER KAZEMINY,
     DANIEL ERICSON, AND
 2   JK HOLDINGS:                    JOSEPH M. WINDLER, ESQ.
                                     WINTHROP & WEINSTINE, PA
 3                                   225 S. 6TH ST., #3500
                                     MINNEAPOLIS, MN  55402
 4                                   612-604-6400

 5   FOR NASSER KAZEMINY AND
     CANDIES ENTITIES:               TONY DAVIS, ESQ.
 6                                   BAKER BOTTS, LLP
                                     ONE SHELL PLAZA
 7                                   910 LOUISIANA ST.
                                     HOUSTON, TX  77002
 8                                   713-229-1547

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                  EXHIBITS

2    PLAINTIFFS/DEBTORS:              Marked    Offered    Received

3    Exhibit Number 1                   10        16          17
     Exhibit Number 2                   11        16          17
4    Exhibit Number 3                   11        16          17
     Exhibit Number 4                   12        16          17
5    Exhibit Number 5                   12        16          17
     Exhibit Number 6                   12        16          17
6    Exhibit Number 7                   13        16          17
     Exhibit Number 8                   13        16          17
7    Exhibit Number 9                   13        16          17
     Exhibit Number 10                  13        16          17
8    Exhibit Number 11                  14        16          17
     Exhibit Number 12                  15        16          17
9    Exhibit Number 13                  15        16          17
     Exhibit Number 14                  16        16          17
10   Exhibit Number 15                  15        16          17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS, THURSDAY, JANUARY 21, 2010, 3:00 P.M.**

2           **THE COURT**:  All right.  Please be seated.

3                Okay.  We're here on the Temporary

4    Restraining Order hearing in the Deep Marine Holdings case.

5    It's Adversary proceeding 10-3026.  We'll take appearances

6    in court, then we'll take appearances on the telephone.

7           **MS. KURTZ:**  Good afternoon, Your Honor.  Marcy

8    Kurtz with Jason Cohen, here on behalf of the Debtor and the

9    Plaintiffs in the adversary proceeding.

10          **THE COURT:**  All right.

11          **MR. MOAK:**  Good afternoon, Your Honor.  Paul Moak,

12   M-O-A-K, on behalf of the Creditor's Committee.

13          **THE COURT:**  All right.  Anyone else appearing here

14   in court?

15       (No audible response.)

16          **THE COURT:**  All right.  On the telephone, we have

17   an appearance from New York.  Who would that be?

18          **MR. PADUANO:**  Your Honor, it's Anthony Paduano and

19   Jason Snyder, dialing in right now for FLI Deep Marine, LLC,

20   Bressner Partners, Logan Langberg, Harley Langberg.

21          **THE COURT:**  All right.  Thank you.

22          **MR. PADUANO:**  And Your Honor, I've submitted a pro

23   hac vice application and also on the phone is -- or dialing

24   is in Lisa Golden from the Jaspan Schlesinger firm, also in

25   New York.

1          **THE COURT:**  All right.

2          **MR. PADUANO:**  At some point will enter her

3  appearance in this case, as well.

4          **THE COURT:**  Okay.  I probably have both of you-all

5  available on the phone right now.

6              Ms. Golden, can you hear me?  Ms. Golden, are

7  you there?

8      (No audible response.)

9          **MR. PADUANO:**  She's supposed to dial in, Your

10  Honor.  I don't know if she's here yet or not.

11          **THE COURT:**  I'm showing I've got two people from

12  your firm both on the phone, so I assume she's somewhere.

13          **MR. PADUANO:**  Thank you, Your Honor.

14          **THE COURT:**  And then I have somebody from the 516

15  area code?

16          **MR. PADUANO:**  That's her, Your Honor.

17          **MS. GOLDEN:**  Good afternoon, Your Honor.

18          **THE COURT:**  Thank you.   Who's here from the 516?

19          **MS. GOLDEN:**  Your Honor?

20          **THE COURT:**  Yes.

21          **MS. GOLDEN:**  Hi.  The 516 number is Lisa Golden.

22          **THE COURT:**  All right.  Thank you.

23          **MS. GOLDEN:**  And we are in the process of also

24  preparing our pro hac vice motion.

25          **THE COURT:**  All right.  Let's not -- anyone who

1    wants to appear in a TRO hearing can appear without the

2    necessity of the pro hac.  I'm not going to get too tied up

3    on that, but thank you for telling me.

4         **MS. GOLDEN:**  Thank you, Your Honor.

5              And then from, I think, New Orleans, who do

6    we have?

7         **MR. ZIMMERMAN:**  Karl Zimmerman from Baldwin Haspel

8    Burke & Mayer, representing Otto Candies, LLC, Otto Candies,

9    III, and Candies Shipbuilders, LLC, which is a creditor in

10   the bankruptcy proceeding.

11        **THE COURT:**  Thank you.

12        **MR. ZIMMERMAN:**  I also filed a pro hac vice

13   application.

14        **THE COURT:**  All right.  I haven't seen any for HUX

15   yet, so same rule for you.

16              In the 612 area code?  Do we have anybody

17   from 612 participating?  Hold on.  I didn't click it right.

18   Let me try that from the 612?

19        **MR. WINDLER:**  Your Honor?

20        **THE COURT:**  Yes.  Who do we have?

21        **MR. WINDLER:**  Joseph Windler with the law firm of

22   Winthrop and Weinstine in Minneapolis.  I represent Nasser

23   Kazeminy, JK Holdings, DMT Ventures, Daniel Ericson, John

24   Hudgeons, and Eugene Diploma in the Delaware proceedings and

25   the Kazeminy's in the bankruptcy proceeding, as well.

1          **THE COURT:**  Thank you.

2               And finally, we have someone from Houston,

3    713-668 exchange?

4          **MR. DAVIS:**  Hi, Your Honor.  Tony Davis.  My plane

5    literally just landed.  I'm here on behalf of the Kazeminy

6    and Candies entities.

7          **THE COURT:**  Thank you.  All right.  I've read the

8    application and some of the exhibits.  There's an opposition

9    brief that I did not see until I just walked out and I now

10   see it on my screen.

11         **MS. KURTZ:**  Did Your Honor want to take a minute

12   to read that?

13         **THE COURT:**  Yeah.  I need to.  I did not realize

14   that had been filed and I apologize.

15         **MS. KURTZ:**  That's fine.  No problem.  Let me --

16         **THE COURT:**  What time did that come in?

17         **MR. PADUANO:**  Your Honor, there's also -- Anthony

18   Paduano, Your Honor.  There's also an affidavit with

19   probably substantial exhibits that we've also put on the

20   PACER.

21         **THE COURT:**  Right.  That's part of that opposition

22   brief, right?

23         **MR. PADUANO:**  There are two separate instruments,

24   Your Honor, two separate documents.

25         **MS. KURTZ:**  The brief, Your Honor, is about 16

1  pages and then there's a rather -- you know, about an inch

2  stack of exhibits attached to an affidavit, which was a

3  document filed just after the memorandum.

4          **THE COURT:**  Right.  I think the way it got filed

5  -- and I just want to make sure I'm reading the right thing

6  -- is that the affidavit got filed along with the brief as

7  an attachment to the brief.  I just want to be sure that's

8  what you want me to read?  And I'm looking -- it got filed

9  at 2:59, so I'm not going to feel too bad that I didn't get

10 to read it before I got out here.

11         **MR. PADUANO:**  That's fine.  No, Your Honor, of

12 course not.  I'm looking at Docket Number 146 that --

13         **THE COURT:**  I've got document 14 is the brief.

14         **MR. PADUANO:**  Correct.

15         **THE COURT:**  And then it has attached to it an

16 affidavit and then the affidavit has attached to it, 21

17 exhibits.

18         **MR. PADUANO:**  Correct, Your Honor, yes.

19         **THE COURT:**  That's it?  Okay.  Let me just step

20 down and let me go read that.  I'm just going to have

21 everybody hold on the phone while I go back and read it.

22 I'm sure this will be ten or 15 minutes and I'll come back

23 and we'll restart the hearing.  Thank you.

24     **(Recess taken from 3:07 p.m. to 3:18 p.m.)**

25         **THE COURT:**  Okay.  Ms. Kurtz, let's go ahead.

1          **MS. KURTZ:**  Thank you, Your Honor.  Mr. Moak may

2  have just stepped to the men's room.  He'll be in just any

3  minute.  I just wanted to tell the Court we're ready to go

4  though.

5          **THE COURT:**  Okay.

6          **MS. KURTZ:**  Your Honor, I think that -- I've been

7  debating here.  I think I'm just going to start in

8  chronological order how this began and bring us to the

9  current, which will then lead into why we're here today, why

10 we're entitled to a Temporary Restraining Order and meet the

11 standard for that and the specific relief we're asking the

12 Court for today, based on the pleadings that are live in the

13 Delaware action.

14          If the Court has the Exhibit Book that was

15 prepared by the Plaintiffs/Debtors in front of you, I'm

16 going to just highlight through what those exhibits are.

17 That will make more sense when I offer those exhibits into

18 evidence, Your Honor.

19    **(Plaintiffs/Debtors Exhibit Number 1 marked for**

20 **identification.)**

21          **MS. KURTZ:**  If you'll look at Exhibit Number 1,

22 the actions between the Delaware Defendants -- I'm sorry,

23 the Delaware Plaintiffs, who are the Defendants in the

24 adversary proceeding, started when they filed a Verified

25 Complaint, which we have as Exhibit Number 1, alleging what

1  they claim on their own, if you look at page 1 to be a

2  shareholder's derivative action claims brought against the

3  Debtors and certain of the other individual Defendants that

4  have been named in the Delaware action.

5      **(Plaintiffs/Debtors Exhibit Number 2 marked for**

6  **identification.)**

7        **MS. KURTZ:**  And that matter, Your Honor, if you'll

8  notice Exhibit Number 2, was dismissed by the court -- by

9  the Chancery Court of Delaware for a failure to follow

10 certain of the rules or to state it even more objectively.

11 Apparently there was a demand by the Plaintiffs in that case

12 for certain information.  The Defendants had not had a

13 sufficient time to respond to that demand for information.

14 The Chancery Court said, "I'm going to dismiss this action

15 and give them a chance to respond."

16     **(Plaintiffs/Debtors Exhibit Number 3 marked for**

17 **identification.)**

18        **MS. KURTZ:**  Shortly after doing that, Your Honor,

19 if you'll look at Exhibit Number 3?  Plaintiff's First

20 Amended Petition was filed in the State District Court in

21 Harris County, Texas.  It is virtually identical to Exhibit

22 Number 1 and it was filed two months after the dismissal of

23 Exhibit Number 1 and after the entry of the Order, Exhibit

24 Number 2.  These claims are also in derivative in nature.

25 They say so themselves on page 3 and otherwise in that

1  Complaint.  They are very similar, if not verbatim, in many

2  cases to the allegations that are found in Exhibit Number 1.

3      **(Plaintiffs/Debtors Exhibit Number 4 marked for**

4  **identification.)**

5          **MS. KURTZ:**  There was an Amended Motion to Dismiss

6  and an Order granting that dismissal, which we've marked as

7  "Exhibit Number 4," where the Defendants in the State Court

8  action in Texas, which were the same as the Defendants in

9  the Delaware -- the first Delaware action, where they sought

10  and obtained a dismissal of the Texas suit because the

11  claims were derivative in nature and that the Plaintiff

12  lacked standing to bring them.

13      **(Plaintiffs/Debtors Exhibit Numbers 5 and 6 marked for**

14  **identification.)**

15          **MS. KURTZ:**  Exhibit Number 5 is the live

16  Complaint.  Exhibit Number 6 is what we've called a

17  "copycat" or a "Me, Too, Complaint," filed by an additional

18  Plaintiff, the same Defendants.  And that -- those are the

19  two actions, Your Honor, 5 and 6, that we're here on today

20  where the Debtors are asking the Court to enter a Temporary

21  Restraining Order until such time as you can determine

22  whether the claims that have been pled in Exhibits Numbers 5

23  and 6 are property of the estate or otherwise stayed as

24  being direct actions against the Debtor.

25      **(Plaintiffs/Debtors Exhibit Number 7 marked for**

1    identification.)

2         **MS. KURTZ:**  Exhibit Number 7, Your Honor, is the

3    Suggestion of Bankruptcy.  As you know, this bankruptcy case

4    was filed on December 4th, here in this Court, and a

5    Suggestion of that Bankruptcy was filed with the Chancery

6    Court in Delaware advising all of the parties and the Court

7    that the action should be stayed.

8         **(Plaintiffs/Debtors Exhibits Numbers 8 and 9 marked for**

9    **identification.)**

10        **MS. KURTZ:**  Exhibits Numbers 8 and 9, Your Honor,

11   are the current as of the submission of the Exhibit

12   Notebook.  Case histories are what we call "Docket Sheets"

13   for the live actions that Complainant Number -- Exhibit

14   Number 5 and similarly, the one that's at Exhibit Number 6.

15   Those are Plaintiffs' Exhibits Numbers 8 and 9.

16        **(Plaintiffs/Debtors Exhibit Number 10 marked for**

17   **identification.)**

18        **MS. KURTZ:**  In response to the Suggestion of

19   Bankruptcy, there wasn't a pleading filed, but instead, the

20   Plaintiffs in the Delaware action prepared a letter to the

21   Court to the Vice Chancellor, dated December 8th, that's

22   been attached as "Exhibit Number 10," advising the Court

23   that they intended to pursue their claims against the

24   non-debtors.

25        **(Plaintiffs/Debtors Exhibit Number 11 marked for**

1    **identification.)**

2         **MS. KURTZ:**  In response to that letter, the

3    Debtor's Counsel in the Delaware action, Mr. K.B. Battaglini

4    of the Greenberg Traurig Law Firm, who is -- has a motion

5    pending in this Court for retention of special counsel to

6    continue that -- it's necessary to continue that

7    representation -- filed a response to the December 8th

8    letter, which you'll find at Exhibit Number 11, advising the

9    Delaware Court, not only of the automatic stay against the

10   Debtors, but also as to the parties related to the Debtors

11   where the claims were aggregated and also advising that

12   Court and all of the parties that the claims were derivative

13   in nature.

14              As -- if you'll go back, Your Honor, I'll do

15   this in the argument now, but if you'll go back and review

16   Exhibits Number 8 and 9, notwithstanding the Suggestion of

17   Bankruptcy filed December 4th and the letter December 11th

18   indicating that the Debtors' view was that the claims

19   alleged in the Delaware action were derivative in nature,

20   the Plaintiffs continued to prosecuted their claims, not

21   again the Defendants, but against all of the non-debtor

22   Defendants, notwithstanding the Debtors' position and

23   statement to the Court that they belong to the Debtor and

24   that the Plaintiffs should not proceed.

25        **(Plaintiffs/Debtors Exhibit Number 12 marked for**

1   **identification.)**

2         **MS. KURTZ:**  The -- as a result of that, Your

3   Honor, I sent a letter, which is Exhibit Number 13, to all

4   of the Counsel in the Delaware action -- I'm sorry, Exhibit

5   Number 12.  I sent a letter to all of the Delaware Counsel

6   advising them not to proceed and if they did, that we would

7   come to this Court and seek injunctive relief, that we

8   prefer not to do that, that it was the Debtors' position, as

9   stated by Mr. Battaglini already, that the claims that they

10  pled were derivative in nature and belonged to the estate

11  and should be pursued by the estate, or a designee of the

12  estate.

13      **(Plaintiffs/Debtors Exhibit Number 13 marked for**

14  **identification.)**

15         **MS. KURTZ:**  The response to that was Exhibit

16  Number 13, where they said essentially they intended to

17  continue to prosecute those claims and causes of action.

18      **(Plaintiffs/Debtors Exhibit Number 15 marked for**

19  **identification.)**

20         **MS. KURTZ:**  If you'll skip to Exhibit Number 15,

21  which was added in an Amended Exhibit List, Your Honor,

22  today the Plaintiffs' Counsel wrote another letter to Vice

23  Chancellor Strine, reiterating that they intended to go

24  forward with their claims against the non-debtor Defendants

25  and arguing that the stay did not apply.

1       **(Plaintiffs/Debtors Exhibit Number 14 marked for**

2  **identification.)**

3              MS. KURTZ:  Exhibit Number 14, Your Honor, is just

4  various emails indicating that notice of today's hearing was

5  appropriate under the circumstances for a Temporary

6  Restraining Order.

7              THE COURT:  All right.

8              MS. KURTZ:  I'd move for submission of Exhibits 1

9  through 15, Your Honor.

10      **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

11  **offered into evidence.)**

12              THE COURT:  All right.

13              MS. KURTZ:  They've been sent to all of the

14  parties.  To my knowledge, on the phone, they were sent to

15  them along with the Exhibit List.  They were sent to them by

16  PDF yesterday.

17              THE COURT:  All right.  Let me hear from

18  Mr. Paduano to start with.

19              MR. PADUANO:  Your Honor, the documents are all to

20  our eyes authentic.  I don't have any objection as to that.

21  We're a little bit handicapped, given the shortness of

22  notice we've had for the hearing to make -- complete so we'd

23  ask the Court at some point for leave to make a supplemental

24  -- to accept the documents introduced for completeness, but

25  as to these exhibits, we don't have objection.

1          **THE COURT:**  Thank you.  We're going to admit them

2    solely for the purpose of the TRO Hearing, not for the

3    purpose of any other hearing, so that if you do need to

4    offer something for completeness, whether we issue the TRO

5    or not, we're obviously going to get to some preliminary

6    injunction hearing, and at that point, all your objections

7    will be preserved and you can offer them at that point, if

8    you need to.

9          **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

10   **received in evidence.)**

11          **MR. PADUANO:**  Thank you.

12          **THE COURT:**  Thank you.

13          **MS. KURTZ:**  Thank you.  Your Honor, we're here

14   today for Temporary Restraining Order Hearing.  We're not

15   asking the Court to decide on the merits today, you know, on

16   two days' notice without adequate time for the Adversary

17   Defendants to respond, to determine unequivocally that the

18   claims -- although we think you could, we're not asking you

19   to do that, that they are unequivocally derivative claims.

20   It is the Debtors' belief based on admissions by the

21   Delaware Plaintiffs themselves, by comments from the

22   Delaware Court, and by following the case law, that the

23   claims are very likely derivative in nature and belong to

24   the estate.

25          And if the Plaintiffs in the Delaware action

1   are allowed to proceed on those actions, which they've

2   indicated as late as today, that they intend to do, absent

3   an Order from this Court, that there will be irreparable

4   harm and injury to the Debtor.

5           And the reason for that would be this is not

6   something where you can say -- proceed and if I'm wrong, we

7   can sue you and we can get a monetary damage.  We're talking

8   about litigation proceeding, so to the extent those claims

9   are owned by someone, and we are not able to prosecute them,

10  that would be an irreparable injury.  That is, in essence,

11  someone taking over control and direction of an asset of the

12  Debtors' estate where we would have no control over how

13  those proceeded.

14          The other -- if there's -- Exhibits Numbers 8

15  and 9, I think, Your Honor, if you go through those, contain

16  adequate evidence for the Court to show that there is an

17  emergency at hand here.  There is discovery outstanding.

18  There are answers that are due by these non-debtor

19  Defendants.  The Court -- I think it's called the "Court of

20  Chancery" in Delaware and the Vice Chancellor there has

21  already entered a ruling that the discovery should proceed

22  at an expedited basis.

23          So if this Court does not enter a restraining

24  order, I think that that lawsuit in Delaware will just

25  proceed far enough down the path that when this Court makes

1    a determination that the claims in the underlying action are

2    property of the estate, we won't be able to "unring the

3    bell."

4              The standard, Your Honor, is irreparable

5    injury, whether there's an adequate remedy at law,

6    likelihood that we would prevail on the merits, once there

7    is a trial, a balance of hardships and the effect on public

8    interest.

9              It's clear that the Plaintiffs intend to

10   proceed absent an Order of the Court.  The injury, Your

11   Honor, I've indicated is irreparable in that it can't be

12   remedied by monetary recompense.  There's no way to say,

13   "We'll pay you back later, if you just let us proceed

14   today."

15             The Delaware Plaintiffs have argued in their

16   response that they should be allowed to proceed and if at

17   some point in the future you decide the claims are

18   derivative, well they will have been prosecuting those on

19   behalf of everybody.  But I think if those claims belong to

20   the estate, the estate can do with them as they please.

21   They could be turned over to the Committee, which, in fact,

22   has already been discussed to the Committee Counsel to

23   investigate and prosecute those claims, as may be

24   appropriate.  They could be compromised, settled.  They

25   could be negotiated in some way as part of a plan.  There

1   are a lot of different things, strategy or otherwise, that

2   could take place if the Debtors themselves were able to

3   manage their own assets.

4           The no adequate remedy at law, Your Honor, is

5   very similar to the irreparable injury.  Sometimes those two

6   are combined when the Court analyzes whether the standard

7   has been met.  Here again, no monetary reward would do, no

8   "unringing of the bell."

9           The substantial likelihood of success on the

10  merits is the most important element.  I'd like to reserve

11  that for last so I could go through the actual causes of

12  action, Your Honor.

13          The balance of the hardships:  The only

14  injury to the Delaware Plaintiffs, Your Honor, would be a

15  delay of time.  The injury to the Debtors is an irreparable

16  loss of their legal right to pursue their claim.  It would

17  be like giving a hard asset away to someone and saying,

18  "Sell it," and we could always take the money later, but

19  they may not -- they may not know the market.

20          They may not sell it for the right price.

21  They may not -- we don't know what they would do with it.

22  And so here, particularly because we're not talking about a

23  hard asset, but a legal right, we have no idea what the

24  strategy would be, or how that litigation would proceed, or

25  whether there would be benefit to other creditors that might

1   be reaped, if, for example, the Unsecured Creditors

2   Committee Counsel were to pursue those claims for the

3   benefit of all of the creditors of the estate.

4            The truth is, there's probably no harm to the

5   public interest.  This is always a difficult element to meet

6   with respect to a TRO, I think, in a Bankruptcy Court, but I

7   think it is always in the public's interest to maintain the

8   status quo until the Court of proper jurisdiction can

9   determine whether there's a right that should be preserved

10  here, and that's what we're trying to do.

11           With respect to substantial likelihood of

12  success on the merits, Your Honor, you have to -- this Court

13  has already written an opinion, which is squarely on point

14  with our facts here.  I don't know that we could have a set

15  of facts any more exact to the facts in the Court's case,

16  *Dexterity Surgical*, at 365 Bankruptcy 690.  In that case,

17  the Court looked to the standard set forth in *Tooley versus*

18  *Donaldson*.  It's *Tooley versus Donaldson Lufkin* -- and I can

19  never pronounce the last name, at 845 A2d 1031, Delaware,

20  2004.

21           The Fifth Circuit has instructed the Courts

22  in the Southern District to look to state law to determine

23  if claims are direct or derivative and this Court has held

24  in *Dexterity* that actions involving the internal affairs of

25  the "corporation" are governed by the law of the state of

1    incorporation.  Here the claims brought by the Delaware

2    Plaintiffs focus on Deep Marine Holdings, Inc., which is a

3    Delaware corporation.

4               From this point, Your Honor, the facts of the

5    underlying lawsuit in Delaware are almost exactly like the

6    facts in *Dexterity*.  What the Court found in *Dexterity* and

7    following the *Tooley* standard, is that the proper analysis

8    to distinguish between direct and derivative actions should

9    be based on who actually suffered the harm, the corporation

10   or the person bringing the claim and who would receive the

11   benefit if the harm was undone.  In other words, once there

12   is a remedy and a recovery, who is going to get that?  The

13   individual shareholders or the Debtor themselves?

14              And seven, analyzing the first prong, it's

15   helpful to ask -- in other words, when -- not just who the

16   name is on the pleading.  You know, "I've sued in my own

17   name and I say that I've been injured," but instead, it's

18   helpful to ask, "Has the Plaintiff demonstrated that they

19   can prevail without showing that there was an injury to the

20   corporation?"

21              And if you go through the specific causes of

22   action in the underlying Delaware case, you can see that

23   they are either directly against the Debtor and/or stayed

24   and we don't really need a TRO, there's been no indication

25   by the Plaintiffs in the Delaware action that they intend to

1   proceed against the Debtor, for example, on the appraisal

2   rights claims.  So while the first cause of action is for

3   appraisal rights against DMT, we don't need a TRO for that.

4   That would be automatically stayed.

5           The second cause of action, Your Honor, and

6   similarly, causes of action two through six, the first --

7   the cause of action two is a claim against the officers and

8   directors for breaches of their fiduciary duty.  And then

9   three, four, five and six are -- I was going to say

10  "clever," but I don't mean to be pejorative -- sort of

11  interesting variations of breaches of fiduciary duty.

12          The third cause of action is a claim against

13  the controlling shareholder Defendants for their breaches of

14  fiduciary duty.

15          The fourth is a claim against the controlling

16  shareholder Defendants for unjust enrichment, which they got

17  as a result of that breach of fiduciary duty.

18          The fifth one is the claim against the

19  controlling shareholder Defendants for aiding and abetting a

20  breach of fiduciary duty.

21          And the sixth one is a claim against the

22  officers and directors for aiding and abetting a breach of

23  fiduciary duty.

24          So they're all really a breach of fiduciary

25  duty claim.  And so they allege in their Complaint, Your

1   Honor, in all of them this -- the ones that are live and in

2   all of the preceding ones that were dismissed where they

3   clearly represented in their pleadings themselves that they

4   were holding derivative claims, that the officers and

5   directors and the other individuals that have been sued,

6   were aiding and approving DMT actions for the private

7   purposes of the controlling shareholders, that would be the

8   Otto Candies entities and also the Kazeminy entities.

9         These actions allegedly include gross misuse

10   of corporate funds, self dealing, corporate looting, failure

11   to follow corporate formalities, gross mismanagement.  They

12   have alleged very specific things, like money going out of

13   the company to some Senator's wife.  They've alleged that

14   there were improper dealings on commercial transactions

15   between the insiders and the company that have caused the

16   company to take on additional debt, which then enabled that

17   particular shareholder to flip that debt to more equity than

18   he was entitled to.

19         But all of those causes of action, you have

20   to prove that there was some damage to the company, and if

21   there was a remedy, if there has been money transferred

22   improperly -- for example, from the company to the Senator's

23   wife -- that would be a fraudulent transfer and the money

24   for that would not go back to the shareholders, who may have

25   been harmed from that, it would go back to the company

1    because everybody -- all of the creditors and parties-in-

2    interest of the Debtor would be harmed by that and would be

3    entitled to reap the benefit of that money coming back into

4    the Debtor.

5                    And so, the Plaintiffs, while they may have

6    been injured, they have been no differently injured than

7    people similarly situated on whose behalf they should be

8    bringing the claims and the remedy would benefit everyone.

9    It would -- the money would come back to the Debtor and the

10   proceeds -- the remedy for that would benefit all of the

11   Creditors and parties-in-interest of the Debtor.

12                   Your Honor, the seventh -- I just was going

13   to reiterate that argument.  I think I can go through it

14   with each of the other claims, but I think two, three, six

15   are identical, Your Honor.  They are just some version of

16   the breach of fiduciary duty.

17                   The seventh cause of action, Your Honor, is a

18   claim against the Defendants in the Delaware action for

19   fraud through active concealment of material facts.  And you

20   know, I was -- you know, honestly I would say this claim is

21   a little harder to call, but where I think the other ones

22   are absolutely and unequivocally derivative actions for the

23   benefit of the estate, I would say that the seventh cause of

24   action is probably both, something that would be a

25   derivative action for the benefit of all of the creditors

1  and something where the minority shareholders could argue

2  that the failure to disclose certain information was

3  directly harmful to them, so there would be an overlap

4  there.

5          But again today, Your Honor, I don't know

6  that we have to make a concrete decision.  We have to show

7  that there is a high likelihood that we would appeal on the

8  merits when there is an actual trial and the fact even that

9  this cause of action could be either one and the same with

10 the eighth one, Your Honor.  Maybe the eighth one -- or the

11 seventh one less so than the eighth one -- where there is --

12 where there could be both.  I mean, I don't know that it

13 would -- I don't think that there is a single claim in here

14 that belongs just to the Defendants, but I think that seven

15 and eight may arguably belong to both.

16         But clearly you could show on the fraud

17 through active concealment of material facts, that it is the

18 Debtor that would reap the benefit, if there was a remedy.

19 The -- I think the argument is that the officers and

20 directors falsified corporate documents to cover up improper

21 payments to third parties.  I think this was the cause of

22 action where they alleged that there were payments to Otto

23 Candies that shouldn't have been made and that that enabled

24 the company to increase the -- carry a higher debt in favor

25 of Otto Candies, which he was then able to flip for a higher

1   percentage interest.

2          So again, they may have been harmed by that.

3   There may be a duplication where there is a derivative

4   action and a direct action, but there is also a derivative

5   action at stake.

6          The eighth cause of action fraud through

7   silence in the face of a duty to disclosure is very similar,

8   both in terms of the facts that are pled, and the cause of

9   action itself for fraud through active concealment -- I'm

10  not sure what the difference is between active concealment

11  and failure to disclose through silence.  I mean, to me, the

12  allegation is that there is a fraud, that they had

13  information they should have disclosed.  Bad things were

14  happening.  The company was looted.  There was financial

15  hardship and damage to the company, which should be

16  rectified for the benefit for all of the Creditors and

17  parties-in-interest.

18         The ninth cause of action claimed for --

19  claimed against the controller shareholder Defendants for

20  wrongful equity dilution:  This is phrased as if it were the

21  shareholders who were hurt by the dilution of the Debtors'

22  equity.  You know, the Court has been clear in the *Dexterity*

23  case and as guided by the Fifth Circuit not to look at how

24  the claims are actually pled or how they're titled, you

25  know, what they called them, but, in fact, to look at the

1   substance of the claim itself.  And the claim for dilution

2   rests on the premise that the Debtors overpaid for assets

3   sold and leased to them by Otto Candies, the same stories

4   again, and then converted that to inflated debt equity and

5   diluting the outstanding shares.

6          So they have pled it as if they were harmed

7   individually, but they weren't.  And it's the company that

8   was harmed by those actions and that would make that a

9   derivative claim.

10          The tenth cause of action is for an

11  accounting and while that is a direct cause of action, it is

12  a claim against the Debtor and would be stayed by the

13  automatic stay without need of a Temporary Restraining Order

14  from this Court.

15          So Your Honor, it's a very long way of saying

16  that this Court has exclusive jurisdiction to determine what

17  is property of the estate by arguing -- by focusing the Vice

18  Chancellor Strine in the Delaware Chancery Court on whether

19  the stay applies to Debtors versus non-debtors, it skips a

20  really important issue.  I think in general -- and at first

21  glance, if this were a different kind of lawsuit, if it were

22  not one that contained derivative actions, that would be a

23  very strong and compelling argument to the Court in Delaware

24  that:  Why are these non-debtors reaping the benefit of an

25  automatic stay?

1              And the parties there might be left with just

2    the argument about the aggregation of claims, that there is

3    indemnity provisions that sort of -- what we call in Texas,

4    "inextricably intertwined," which they don't use in

5    Delaware, but that kind of argument.  In this case, though,

6    I think the more compelling argument is that the claims

7    belong to the estate.  So it's not that the actions are

8    stayed against non-debtors.  It's that they very likely

9    should proceed, but they should proceed through this Court,

10   either by the Debtor or a designee of the Debtor.

11             And I think that's important.  I understand

12   the Delaware Plaintiffs' argument, which they pled in sort

13   of a notice way, their response, which I also understand on

14   short notice, that you know:  Why would we want the Debtors

15   to pursue this claim?  I mean, you know, they are the

16   targets here, but the law says that those claims belong to

17   the Debtor and now really the Debtor is a new entity.

18   Courts recognize that Debtors are really a new and different

19   entity than the entity that existed on December 3rd and the

20   difference we have here is that I have a Creditor's

21   Committee who is very interested in these same claims, to

22   investigate them, to determine if there has been wrongdoing

23   by the officers and directors.

24             So while those claims belong to the estate, I

25   would anticipate from a lot of angles, that there would be

1    constituencies already active in this case, who may not want

2    the Debtor to have sole control or any control over those

3    claims and causes of action.

4             **THE COURT:**  Didn't we displace management?

5             **MS. KURTZ:**  Yes.  We've got a Chief Restructuring

6    Officer.  That's why I was going to say, so --

7             **THE COURT:**  So forgetting the Committee for a

8    minute, we don't have --

9             **MS. KURTZ:**  Correct.

10            **THE COURT:**  -- the same management people?

11            **MS. KURTZ:**  We do not.

12            **THE COURT:**  Okay.

13            **MS. KURTZ:**  We do not, although to be clear and

14   you know, Your Honor, the former President and the former

15   Chief Financial Officer are still assisting the Chief

16   Restructuring Officer, in different capacities.  They both

17   are extensively helping with marketing efforts, either for

18   the sale of the vessels or for investors to invest in the

19   company for reorganization.

20                  I'm not prepared to say today what the long-

21   term likelihood is of employment for those --

22            **THE COURT:**  But official control is vested, as I

23   recall by our Order, exclusively in the CRO.

24            **MS. KURTZ:**  And he is exercising that exclusively.

25            **THE COURT:**  Okay.

1    **MS. KURTZ:**  So he would either keep those, or if

2  there was substantial push back and/or an order from this

3  Court, we have had preliminary discussions with the

4  Unsecured Creditor's Committee, you know, so that they could

5  do conflicts checks, if we -- if we needed to punt that

6  particular litigation or investigation, would they be

7  prepared to take that?

8          So we believe strongly that the claims belong

9  to the estate for the benefit of all of the creditors and

10  parties-in-interest.  We understand that there could be an

11  argument that the Debtor may not be the perfect person to

12  pursue those.

13          Our argument back would be:  We have a Chief

14  Restructuring Officer.  We have independent management

15  today.  If you're still not satisfied, we have an Unsecured

16  Creditor's Committee.  Those make the facts very different

17  than they were on December 3rd and prior in time.

18      **THE COURT:**  All right.  Mr. Paduano, what kind of

19  response do you have?

20      **MR. PADUANO:**  Your Honor, thank you very much.  I

21  want to make it very clear that what's pending in the

22  Delaware Court is not a derivative action.  They're direct

23  claims against the Defendants there.  And the Counsel has

24  correctly stated that we have disclaimed any interest in

25  anyway of pursuing anything in light of the bankruptcy stay,

1  any claims against Deep Marine Holdings, Inc. or Deep Marine

2  Technology.

3           So Your Honor, then to the extent the

4  argument and the application for this Court is based on the

5  analogous of how we've got derivative claims, it's just not

6  the case.  Moreover, the reliance the Court has just heard

7  about Your Honor's decision in *Dexterity* and the Delaware

8  case that underlies that concern shareholders.  We are not

9  shareholders of the Debtors.  Our shares have been canceled,

10 in a word, and the Court can look at Exhibit "O" to my

11 affidavit.  It shows the merger of what our interest to

12 another entity and don't have an interest right now, the way

13 the law works in Delaware, in either of the Debtors.

14          And clearly, Your Honor's decision in

15 *Dexterity* and the Delaware *Tooley* case be to shareholders

16 and then was trying to evade the automatic bankruptcy stay.

17 We're not shareholders.  They and another machination, which

18 I'll get to in a second, cancelled our shares by doing a

19 short form Delaware merger.

20          And Your Honor, that gets to the point of

21 what's going on here.  What's going on here, as Counsel

22 says, they asked the Delaware Court to stay our action.

23 They filed the Suggestion of Bankruptcy.  That is attached

24 to Exhibit F of my Affidavit, giving notice once the

25 Delaware Court was going to allow the case to proceed,

1    actually on an expedited basis, that these entities that

2    have been merged literally out of business, were going to

3    file for bankruptcy and the Delaware Court, as Counsel

4    correctly stated, set an expedited schedule for discovery.

5              And the reason for that is that these

6    Defendants here, specifically Mr. Candies and Mr. Kazeminy,

7    the Candies' entities, Mr. Candies and Mr. Kazeminy, we

8    think seriously made misrepresentations to the Delaware

9    Court.  This dispute started in the fall of 2008 when on a

10   confidential basis, a source came to our clients.  It's a

11   very small corporation with very few shareholders, that

12   there was wrongdoing.  Our client, under Delaware law, made

13   a demand as they must to the corporation asking that the

14   corporation investigate the wrongdoing and see if there was

15   merit to it, and we made that demand.

16             For more than five months, nothing happened

17   with that demand.  In the interim, we sued.  We did, in

18   fact, file a derivative action in Delaware.  And the

19   Defendants met that that action with a Motion to Dismiss,

20   saying that our client was not ripe, that dismissal was

21   because the Special Committee Minister Battaglini was

22   counsel to -- Greenberg Traurig was Counsel to -- said it

23   hadn't had enough time after three months to complete its

24   work.  So the Delaware Court dismissed without prejudice and

25   allow the Special Committee to complete its work.

1          The Special Committee completed its work on

2    June 30th, 2009.  The next day -- there's a typo in my

3    affidavit, Your Honor.  I apologize for that.  The next day

4    on July 1st, 2009, our shares were cancelled -- our clients'

5    shares were effectively cancelled and there was a short-form

6    Delaware merger, which the Kazeminy entities and the Candies

7    entities were entitled to do because of their vast majority

8    holdings in this closed corporation.

9          Thereafter, Your Honor, we filed the current

10   action that the Defendants seek to have, in effect, stayed

11   because they believe in some form that it runs afoul of the

12   stay, and our claims don't.  This was, as they say, the

13   Court when it takes the time to go through our papers, there

14   are a few shareholders.  We identified wrongdoing.  The

15   company had been valued as we pled in Delaware at more than

16   100 million dollars -- derivative transaction for more than

17   100 million dollars.  On July 1st, 2009, the company's value

18   was nothing.  There's a valuation that's attached in the

19   papers here.  I'm sure the Court noticed a merge in

20   Exhibit O that shows their shares were worth a dollar.

21          And Your Honor, we've got serious claims

22   against these non-officers, non-directors of the bankruptcy

23   entities for what they've done to our shares.  They had

24   duties to us.  They have fiduciary duties to us as majority

25   shareholders, as organizers of the investment, a host of

1   duties and frankly, the reason that they wrote to your Court

2   seeking a TRO is because the Vice Chancellor Shrine is, I

3   think, going to hold her feet to the fire and say that that

4   entities that are not encompassed by the Bankruptcy Court

5   stay are entitled to that protection, and that includes

6   Mr. Candies, Jr., Mr. Candies, III, Mr. Kazeminy, DCC

7   Ventures and JK Holdings Corporation and KOC, Otto Candies,

8   LLC and obviously there's issues with the former directors,

9   who might have greater claim to the protection of this

10   Court, but I don't think that the organizers of the

11   investment.  Outside investors, who were neither directors,

12   nor officers, who were employees of the bankrupt entities, I

13   don't think they get to enjoy the stay at all.

14              So we do have these direct claims because

15   they have done things that have destroyed our values.

16   Counsel has conceded that the ultimate chance we take of the

17   success on the merits by the Debtors here is nil.  She just

18   said that some of these claims may be joint, even if their

19   analysis somehow they've got a derivative action in

20   Delaware, even though it's not apprised, at some point we

21   get to pursue those claims against these people who have

22   wronged us and I don't see how a stay can be issued when

23   we've got a concession that claims may be pursued at all.

24              As to the argument somehow that there's

25   irreparable injury here, these entities, as far as we know

1    in Delaware, we've been deprived of lawsuit, has no idea

2    what has happened to them at all, except for the valuation

3    that showed them at no values as of July 1st, 2009.  I don't

4    know how they could possibly be injured by re-pursuing

5    claims against non-officers, directors and employees,

6    agents, in another forum at all.

7                    And this concept, somehow that the claims

8    that we have regarding our shares and what was our seven

9    million dollars that we were entitled to, the value of our

10   shares before this deceit started, somehow belongs to the

11   corporation or to other creditors, I don't see that at all.

12   I don't see how they could possibly apply because again, our

13   claims don't run against the corporation.  Now in light of

14   the stay, we can't pursue, but clearly against the actions

15   that Mr. Kazeminy took and Mr. Otto, the entities and others

16   that they took, we clearly get to pursue those.

17                    They ran the companies as their Candy Store

18   and we got close to them and came very close to firming

19   things up in Delaware.  They cancelled out shares -- a very

20   aggressive act.  It clearly got the attention of the

21   Delaware Court, which is why we're on the phone today

22   because I don't know how they're going to explain that

23   result to the Delaware Court.  So the concept somehow that

24   these claims should be -- our claims in Delaware should be

25   stayed and surrendered to Counsel that's being retained by

1   these two entities that were worth a dollar as of July 1st,

2   2009 because of being pursued by Counsel, that is nominated

3   by the Debtors to pursue them as to others where they're

4   speculating that at some point their bills are being paid by

5   Mr. Kazeminy and Mr. Candies, who orchestrated these

6   entities and do stuff to invest in the entities and have

7   done everything to frustrate our interest into that.  The

8   concept of this claim is being pursued diligently, fairly --

9   analyzed diligently and fairly at all, so we cannot -- I

10  don't see how Counsel can possibly overcome that conflict in

11  any way.

12              So even if there were Proof of Claims

13  ultimately it wouldn't be the estate controlled by these

14  same entities that would be pursuing those claims.  So, Your

15  Honor, this is not a situation where the *Dexterity* decision

16  applies.  It's not something where you've got parties, us,

17  in front of you who are trying to end around the stay at

18  all.  I think they've been chewed by half by cancelling our

19  shares.  They began arguing that we were shareholders trying

20  to get around your stay, but we're not.  We're former

21  shareholders.  They kicked us out.  We don't have a claim,

22  according to them if they're to be believed as to the equity

23  or debt or assets or anything of Deep Marine Holdings and

24  Deep Marine Technology and the four special purpose entities

25  that we're unfamiliar with, that are part of the action in

1  your Court.  They kicked us out.

2              So we'd like to sue them, but you know, the

3  stay is there, but at the end of the day, if they're right,

4  they've short-form merged us out of our equity positions.

5  You know, we don't have a claim there.  We have an appraisal

6  proceeding in Delaware that's already been commenced, that's

7  starting, that under Delaware law is supposed to go forward

8  to assign a value, their value, to our shares we would

9  clearly then say because that involved the Debtors of Your

10  Honor's Court.

11             So Your Honor I don't think there's a record

12  in front of you to take the extraordinary action of truly

13  taking away the jurisdiction of the Court in Delaware that's

14  got these claims in front of it that is dispute has been

15  kicking around in various forms and so for well over a year

16  and we have the Court in Delaware to help us.  We got in the

17  Court in Delaware to expedite things because the assets have

18  been taken away from us and now we must pursue these

19  individuals.

20             Our task is quite difficult and we take this

21  as just another effort to make it that much more difficult

22  and much more expensive for our clients.  So we'd ask the

23  Court to deny the TRO Application in its entirety to the

24  extent that if the Debtors want to go forward after some

25  discovery to see what actually is going on and where the

1  right to remedies actually lie after discovery, we could

2  appear back before the Court for a preliminary injunction, I

3  would ask that the most that this Court does is strike at

4  this time.

5            Thank you.

6        **THE COURT:**  All right.   Thank you.

7            All right.   I'm granting the Temporary

8  Restraining Order and let me give the reasons why I'm going

9  to grant the Temporary Restraining Order:  Actually, I

10 oftentimes deny Temporary Restraining Orders because I think

11 that we need to be extraordinarily careful in issuing one,

12 but having reviewed really the four corners of the Complaint

13 to determine what the story is, I think that the Plaintiffs'

14 view of what the Complaint says -- not maybe what it could

15 say, not maybe what somebody wants it to say, but what it

16 says unambiguously largely states claims that are property

17 of the estate.

18            I am guided today by Fifth Circuit law that

19 says that if something is arguably property of the estate,

20 that it is a violation of the automatic stay to exercise any

21 control over it or to take any action against it and I refer

22 the parties to the *Chestnut* case at 422 F.3d 298.

23            We have jurisdiction over this matter under

24 20 U.S.C. Section 1334.  It is a core matter under 20 U.S.C.

25 Section 157 in determining whether to grant a Temporary

1   Restraining Order, I will follow Fifth Circuit law under

2   *Speaks versus Cruz*, at 445 F.3d 396, a 2006 Fifth Circuit

3   case, the standard for standard, substantial likelihood of

4   success on the merits, a substantial threat of irreparable

5   harm if the injunction is not granted, that the threatened

6   injury to the Movant outweighs any harm to the Non-Movant

7   that may result from the injunction and that the injunction

8   will not undermine the public interest.

9           First, is there a substantial likelihood of

10  success on the merits?  My answer is that I think there's a

11  pretty overwhelming likelihood of success on the merits as

12  the Complaint is now pled.  Now I think that Mr. Paduano

13  makes persuasive arguments that there may be a complaint

14  that they can file that would not violate the automatic stay

15  and when an amended complaint gets presented to me, if it

16  gets presented before the expiration of the TRO or if it

17  gets presented at the Preliminary Injunction Hearing, this

18  ruling may change and it may change very dramatically for

19  those of you that are interested in the outcome.

20          I'm ruling on this Complaint, not really on

21  the Complaint described by Defendant's Counsel.  Let me just

22  go through -- and I'm not going to go through every

23  paragraph of the Complaint right now, but I'm going to go

24  through some of the Complaint and just say why I think this

25  is a fairly obvious decision.  The Complaint starts off by

1    saying, "This action is filed by the victims of a conspiracy

2    to loot Deep Marine Holdings and its subsidiaries, including

3    its wholly owned subsidiary, Deep Marine Technology."  It's

4    a corporate looting case.  That is what is pled.

5              When I do to the causes of action, I think

6    everybody agrees that the cause of action for appraisal

7    rights is stayed.  The second cause of action is a claim for

8    general breach of fiduciary duties, without really

9    describing what those breaches are, but referencing back to

10   paragraphs 1 through 148, that largely describe the looting,

11   the self-dealing, the misuse of corporate funds, and

12   describe them in way that, you know, frankly are very

13   persuasive and offensive if true.  I'm obviously not

14   deciding what's true, but there is a major corporate looting

15   case is pled here.

16             When I look at the third cause of action, it

17   gets more specific than the second.  Paragraph 157, however,

18   goes and says, "Otto Candies sold vessels and equipment,

19   some of which were not seaworthy and required hundreds of

20   thousands of dollars to repair to DMT at inflated prices

21   while Otto Candies was a controlling shareholder of DMT and

22   while Otto Candies, III, was a member of DMT's Board of

23   Directors.  By reason of the actions described above, Otto

24   Candies and Otto Candies, III, breached their fiduciary

25   duties to DMT by engaging in a classic case of self-dealing

1    thereby looting DMT and its subsidiaries, unfairly diluting

2    minority shareholder Plaintiffs and diminishing the value of

3    Plaintiffs' DMT stock."

4              This cause of action has nothing to do with

5    the theft of the shares.  It has to do with looting of the

6    corporation.  The unjust enrichment is the same kind of

7    Complaint.

8              The fifth cause of action, again we don't get

9    the specifics.  We're incorporate prior paragraphs, but by

10   incorporating them in each of these situations as the basis

11   for the cause of action, what the Plaintiffs rely on is

12   injury to the corporation for the measure of the damages to

13   the Plaintiffs and when they rely on injury to the

14   corporation as the measure of the damages to the Plaintiffs,

15   they are stating a cause of action that in my mind -- at

16   least arguably under *Chestnut* and I think probably more than

17   arguably, belong to the estate to bring.

18             The seventh and eighth causes of action are

19   sufficiently ambiguous that I don't know what they are.

20   Again, they incorporate the prior paragraphs.  By

21   incorporating the prior paragraphs, they arguably are

22   property of the estate and that is the standard I am

23   required to follow under *Chestnut*.

24             The wrongful equity dilution, I agree almost

25   precisely with the way that Ms. Kurtz described it, which

1  although it is described as a shareholder dilution, what it

2  says is that the shareholders were diluted because assets of

3  the corporation were diverted out and by doing that, it

4  diluted the value of the shares by diversion of corporation

5  assets.

6          And finally, of course, the accounting is the

7  direct claim against the Debtors.

8          I find that as pled, every claim is either

9  actually or arguably a claim that is owned by the estate or

10  is a claim against the Debtors.  I therefore find there is a

11  substantial likelihood of success on the merits.

12          With respect to a substantial threat of

13  irreparable harm if the injunction is not granted, I find

14  there is irreparable harm for two primary reasons.  The

15  first is:  The law holds that a violation of the stay is by

16  definition irreparable injury.  So if they are violating the

17  stay by exercising control in violation of Section 362(c) --

18  excuse me, 362(a), that is, in fact, a violation of the stay

19  and it satisfies a substantial threat of irreparable harm.

20          Second, I think there is irreparable harm if

21  the injunction is not granted because in all likelihood,

22  prosecution of the cases is a void act, and if we get to a

23  prosecution and a result and it's void, that result is going

24  to create such a mess, I don't think we'll ever be able to

25  put Humpty Dumpty back together again.  It just makes no

1  sense to allow it to proceed until what is pled is what they

2  have a right to proceed on.

3              Three, that the threatened injury to the

4  Movant outweighs any harm to the Non-Movant that may result

5  from the injunction.  I think absolutely that is the case

6  from what I have seen.  The Debtor owns these claims, at

7  least some of them without question.  All of them the Debtor

8  arguably owns or the Debtor is a Defendant in.  It is

9  unreasonable to believe that somebody else should be able to

10 control that without injuring the Debtor and moreover, the

11 probability that these actions would then ultimately be

12 determined to be void makes the problem even worse.

13             I frankly don't see any harm to the

14 Non-Movants under this situation.  They want to proceed with

15 litigation, but they have not argued or shown me any harm to

16 them in delay other than that they want to move ahead, and I

17 understand wanting to move ahead and we're going to set

18 things relatively promptly here, but wanting to move ahead

19 does not constitute injury.  There just isn't any injury

20 that at least has been argued to me of holding up, taking a

21 breath, and seeing what's going on in this situation.

22             Moreover, an awful lot of what is argued as

23 the injury has to do with the fact that "The crooks are in

24 charge of suing the crooks," is the way that I'm going to

25 put it.  I don't think that's what's going on in this case.

1  One of the very first things that we did was we ordered that
2  the people that are being complained about were divested of
3  control over the case.
4          I know that the folks on the phone don't know
5  me, but I probably have a reputation down here for turning
6  down Motions to Compromise Controversies more than any other
7  judge in this state does.  I do turn those down
8  unfortunately for people fairly regularly and the
9  probability of me rubber stamping a compromise that is going
10  to allow these folks to walk away in the light of -- if I
11  get a good objection to it, it's fairly low.  I mean, I take
12  my 9019 responsibilities with a great deal of seriousness
13  and perhaps more seriously than some people would like for
14  me to do, but I think there probably shouldn't be a whole
15  lot of worry, that I'm going to end up rubber stamping a
16  9019 motion.
17          And I would also tell the folks, you need to
18  come oppose it.  It's not that I'm just going to go out on
19  my own, but opposed 9019 motions here get treated with a
20  great deal of serious evaluation.
21          Finally, with respect to public interest, I
22  think the Fifth Circuit standard is that the injunction will
23  not undermine the public interest.  I don't think this one
24  does, so I'm going to issue the Temporary Restraining Order.
25  It obviously doesn't last very long.  This is the first TRO

1   that I've issued since the new rules.  I don't know if it's

2   a 14-day standard or a 10, but I'm going to look it up.

3                Let me see.  Fourteen days under Rule 7065 as

4   applying Rule 65(b)(2), so we need to have a hearing within

5   the next two weeks.

6                Mr. Paduano, I'd rather set this at your

7   convenience, since you're going to be traveling.  Can you

8   tell me a convenient time for you during the week of

9   February the 1st and I'll try and get you a hearing on a day

10  that's convenient to you?

11       **MR. PADUANO:**  It's the -- sorry, Your Honor.  I'm

12  just looking.

13       **THE COURT:**  And obviously, you're welcome to

14  participate by phone, but I suspect you're going to want to

15  be here.

16       **MR. PADUANO:**  Yes.  I will be.  One second, Your

17  Honor, please?

18       **(Pause)**

19       **MR. PADUANO:**  Your Honor, I take it the Court

20  still has discretion to move things out a little bit.  Would

21  February the 8th work, the Monday?

22       **THE COURT:**  I can go to the 8th, if you want to

23  consent to the entry of the TRO, but I can't if you won't.

24       **MR. PADUANO:**  We will consent to it.

25       **THE COURT:**  Okay.

1          **MR. PADUANO:**  We will consent then up to the date.

2          **THE COURT:**  Right.  Well, you're going to consent

3     that I'm going to issue an TRO for longer than the 14 days,

4     is what you're going to consent to?

5          **MR. PADUANO:**  Yeah, I understand the Court's

6     ruling is we do consent to the additional period of time,

7     yes.

8          **THE COURT:**  Okay.  I actually have time on the

9     8th.  I think a trial must have cancelled.  I'm not sure

10    why.  I've got -- let me just open a couple of docket

11    settings I've got and see how time consuming they're going

12    to be.  What I proposed to do is to limit each side for

13    maybe an hour and a half for their preliminary injunction

14    presentation, maybe two hours, and see if that works for

15    everybody?  Does that work for both sides?

16         **MR. PADUANO:**  Yes, Your Honor.

17         **MS. KURTZ:**  Did -- I'm sorry, Your Honor, did you

18    give us a time on the 8th?  I've --

19         **THE COURT:**  Well, I'm going to look at that.  I'm

20    trying to figure out, can you live with an hour and a half

21    to two hours for your presentation?

22         **MS. KURTZ:**  Okay.  I'm sure.  I mean, two hours

23    would probably be better, but I usually go under.  That's

24    fine.

25         **THE COURT:**  I can give you two hours.  How do you

1    look on the 8th?

2          **MS. KURTZ:**  And Your Honor, I've got a motion -- I

3    know it sounds small, but I've got a Motion for Relief from

4    Stay hearing set -- let me see if that's the 8th or the 9th.

5    I apologize.  Give me one minute.  No, it's the 9th.  I'm

6    clear on the 8th, I'm sorry.  I'm clear on the 8th.

7          **THE COURT:**  Let me see what I've got.  If I set

8    this for 2:00 o'clock in the afternoon and then we go till

9    6:00, will that let you take a morning flight in,

10   Mr. Paduano?

11         **MR. PADUANO:**  Your Honor, whatever time is

12   convenient for the Court.  I'll probably be there the day

13   before.

14         **THE COURT:**  We can start it -- we can start at

15   10:45 in the morning, if you-all want to.  We'll take a

16   fairly -- at 1:30 I've got a hearing that's going to take

17   about 15 minutes.  I've got a 9:00 o'clock.  I just want to

18   be sure it's over before everybody shows up, so if you-all

19   want to start at 10:30, 10:45, and then I'll give each side

20   two hours.

21         **MR. PADUANO:**  10:30 would be great, Your Honor.

22         **THE COURT:**  All right.  We'll issue the TRO.  I'll

23   get all the findings of fact.  I've got to incorporate them

24   actually into writing, I think, under the rules for that,

25   but I will get that done.  The TRO will probably go out

1   tonight.  If not, it will go out in the morning.

2                   We'll set the hearing for February 8th at

3   10:30 in the morning on the Preliminary Injunction.  By

4   agreement, each side is going to be limited to two hours for

5   their control of court time that will include your direct

6   examination of any witness and any cross-examination.  It

7   will include any opening and closing.  I'll read your

8   materials beforehand to try and save you having to do an

9   opening.  And we'll have the full time allotted.

10                   Just be sure to reserve that time for me,

11   Ms. Smith.

12                   Anything else we need to do today?

13          MR. PADUANO:  Would the Court entertain a -- would

14   it be possible to take some limited discovery in aid of our

15   hearing?

16          THE COURT:  Absolutely.  You're entitled to all

17   the discovery that you-all can notice up and get done.  If

18   you want me to compel some right now, I'd probably prefer

19   that you-all confer first and if you don't reach an

20   agreement, file a Motion to Compel and I'll get discovery.

21          MR. PADUANO:  Great.  We'll do that, Your Honor.

22   Thank you.

23          MS. KURTZ:  The discovery, Your Honor, I just want

24   to be clear, would be in connection with the ownership of

25   the claims?

1      **THE COURT:**  Well, it's going to have to be

2 connection with the merits of the preliminary injunction

3 that's being sought.

4      **MS. KURTZ:**  Right.  But I mean --

5      **THE COURT:**  So I don't want to say it's only that

6 because, I mean, there may be some other issues.  It isn't

7 obviously an underlying merits discovery, but there may be

8 things that are broader than who owns the claims.

9      **MS. KURTZ:**  You answered my question in your

10 comment.  Thank you.

11      **THE COURT:**  Thank you.   Yes, sir?

12      **MR. MOAK:**  Your Honor, on behalf of the Committee,

13 obviously we're not parties to the action, but we would like

14 the opportunity to participate at the preliminary injunction

15 hearing.  Obviously, Ms. Kurtz --

16      **THE COURT:**  Whose side are you going to take?

17      **MR. MOAK:**  We came today to speak in support of

18 Mrs. Kurtz' client, the Debtors, and we will do that at the

19 preliminary injunction hearing and we will coordinate with

20 her, so as not to duplicate our effort.  In part, the reason

21 I didn't speak today, Your Honor, was because she basically

22 covered every topic that I would like to have covered,

23 but --

24      **THE COURT:**  I'm not sure that you'll be a party to

25 it, but if you -- if the other side doesn't object, I'll

1  deal with it, but certainly I'm going to make you get time

2  from her, out of her two hours.

3        **MR. MOAK:**  We understand, Your Honor, and we'll

4  coordinate with her.  I appreciate that.

5        **THE COURT:**  But I don't want to make a statement

6  today because I don't know what the other side's position

7  will be as to whether you should be allowed to participate

8  or not.

9        **MR. MOAK:**  It may be then, Your Honor, in light of

10 that, we may file a Motion to Intervene.  I'm just going to

11 try to give that --

12        **THE COURT:**  If you file a Motion to Intervene,

13 I'll take it up at that point.

14        **MR. MOAK:**  Thank you, Your Honor.

15        **THE COURT:**  Thank you.

16        Anybody else need anything clarified today?

17     (No audible response.)

18        **THE COURT:**  Okay.  Thank you for the presentation.

19 I appreciate getting educated about this.  I will get a TRO

20 out, I hope before I go home tonight.

21        Thank you.

22        **MR. PADUANO:**  Thank you, Your Honor.

23        **(Proceeding adjourned at 4:12 p.m.)**

24

25                    * * * * *


                    JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1  *I certify that the foregoing is a correct transcript from*

2  *the electronic sound recording of the proceedings in the*

3  *above-entitled matter.*

4  */s lmartin*

5  _____

6  *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

7  *JTT JOB/INVOICE # 28061*

8  *DATE: JANUARY 25, 2010*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25