# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC. | § | Case No. 09-39313 |
| et al. | § | |
| | § | Jointly Administered Chapter 11 |
| | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| DEEP MARINE HOLDINGS, INC., | § | |
| and DEEP MARINE TECHNOLOGY | § | |
| INCORPORATED | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 10-3026 |
| | § | |
| FLI DEEP MARINE LLC, BRESSNER | § | |
| PARTNERS, LTD., LOGAN | § | |
| LANGBERG, HARLEY LANGBERG, | § | |
| and DEEPWORK, INC. | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## SUBPOENA OF THE SPECIAL COMMITTEE'S REPORT

**Dated: May 21, 2010**

**PADUANO & WEINTRAUB LLP**
**1251 Avenue of the Americas**
**Ninth Floor**
**New York, New York 10020**
**(212) 785-9100**

**Attorneys for Defendants**

Defendants FLI Deep Marine LLC, Bressner Partners, Ltd., Logan Langberg and Harley Langberg ("Defendants") respectfully submit this memorandum of law (i) in support of their subpoena issued for a copy of the report prepared by or on behalf of the special committee (the "Special Committee") of the board of directors of Deep Marine Holdings, Inc. and (ii) in opposition to the claims of the Debtors that the report is protected by the attorney-client privilege.

## PRELIMINARY STATEMENT

For the past year, the Debtors have prevented the Defendants from obtaining a copy of the report prepared by counsel for the Special Committee of Deep Marine Holdings, Inc.[1] (the "Report").  The Report, on information and belief, contains the findings of the Special Committee's investigation of the allegations made by the Defendants to the Debtors' board of directors in October 2008.  The Debtors' most recent objection to providing the Defendants a copy of the Report is that the Report is subject to attorney-client privilege held by the Debtors as "owners" of the Report.  The Report, however, is not owned by the Debtors, but rather by the "client" that commissioned the Report – the Special Committee, which both DMT and the Special Committee have vehemently argued were separate and independent entities.  Thus, the Debtors cannot assert any attorney-client privilege in connection with the Report.

Moreover, while the Debtors have prevented the Defendants from obtaining a copy of the Report, the Debtors and the Special Committee – and their

---

[1] Deep Marine Holdings, Inc. and its subsidiary, Deep Marine Technology Incorporated, are referred to variously as "DMT" or the "Debtors."

respective counsel – admittedly have disclosed the Report to numerous individuals and entities, including some of the individuals who were the subjects of the Special Committee's investigation detailed in the Report, adversaries in two separate court proceedings, eight separate counsel for the Debtors' two controlling shareholders, counsel to the Chapter 11 creditors committee, and the Debtors' Chief Restructuring Officer.  In addition, counsel for the Special Committee submitted the Report into evidence in litigation in Harris County, Texas, with full knowledge that by doing so the Report would become part of the public record.

These broad disclosures, especially the disclosures to adversaries and to the general public, establish that the Debtors never acted to preserve any confidential attorney-client privileged material.  And any such privilege has long since been waived in any event.  Given the wide distribution of the Report, the Defendants fail to see how the Debtors – who are not even the owners of the Report or the associated privileges – would be prejudiced by the disclosure of the Report to the Debtors.

## FACTUAL BACKGROUND

On October 10, 2008, the Defendants sent a Demand Letter to DMT's board of directors, alerting the board to various improprieties at DMT involving DMT's officers, directors, and controlling shareholders.  In response, in mid-October 2008, DMT's board created the Special Committee to investigate the allegations.  For more than eight months, the Special Committee purportedly investigated Defendants' claims.  On June 30, 2009 the Special Committee

released a press statement declaring it had found no wrongdoing in the course of its investigation.   But the Special Committee refused to send or even show its report to anyone, including the Defendants.

The <u>very next day</u>, as part of a scheme to rob the Defendants of their DMT shares and their standing to re-file their action in Delaware[2], DMT commenced and concluded a Delaware Section 253 short-form merger without notice to or consent of the Defendants, pursuant to which the Defendants were squeezed out as shareholders of DMT for one cent per share.[3]   The Defendants eventually filed an appraisal action in Delaware court.   As part of that action, the Defendants sought a copy of the Report, but the Special Committee's counsel refused to provide a copy of the Report unless the Defendants' counsel signed an unusually restrictive confidentiality agreement that would have prevented the Defendants' counsel from sharing the Report with the Defendants.   The Defendants therefore rejected the Special Committee's "offer" and were prepared to argue in the Delaware court for the production of the Report when the Debtors filed for bankruptcy protection and the automatic stay was imposed.

---

[2] The Defendants' original Delaware action had previously been dismissed in order to give the Special Committee an opportunity to complete their investigation.  By consummating the short form merger, DMT effectively stripped the Defendants' of their standing to re-file their derivative action, which required the Defendants to be DMT shareholders.

[3] On information and belief, less than 18 months prior to the short form merger, the Debtors were valued at more than $100 million.  Although the short form merger offered compensation of $0.01 per share which the Defendants were in the process of contesting in Delaware court when the Debtors filed for bankruptcy, the Defendants have not received any compensation in exchange for the confiscation of their shares.

On January 19, 2010, the Debtors instituted this adversary proceeding against the Defendants. The Defendants repeatedly sought production of the Report as part of the adversary proceedings, and were repeatedly turned down by the Debtors, even though the Special Committee and/or the Debtors had disclosed the Report to numerous individuals, including adversaries in the Delaware litigation and this adversary action (Deepworks, Inc.) and in Cause No. 2008-64385 filed in the District Court of Harris County, Texas (the "Harris County case").

On February 3, 2010 the Defendants issued a subpoena to Paul McKim seeking production of his copy of the Report. Mr. McKim was the founder and former chief executive officer and chairman of the Debtors, but was an adversary of the Debtors in the Harris County case. It was in the Harris County case that Mr. McKim obtained his copy of the Report. On February 4, 2010, Mr. McKim filed a Motion for Entry of Order Regarding Subpoena with this Court. According to Mr. McKim's motion, he had no objection to providing the Defendants with a copy of the Report, but was concerned about a protective order that had been issued by the Harris County court.

This Court held a hearing on Mr. McKim's motion on February 19, 2010, at which time the Debtors repeated their argument that the Report was subject to the attorney-client privilege. The Court then set a schedule for the Debtors to provide the Court with a list of all the recipients of the Report. The Court also requested briefing from the parties on the issue of whether the attorney-

client privilege attached to the Report, and whether such privilege had been waived.   On May 7, 2010, the Debtors filed a Supplemental Statement (the "Supplemental Statement") containing a list of "the persons to whom the SLC Report has been disseminated according to the Debtors' records, the records of the Debtors' counsel, and the responses to the letter sent out to the Recipients listed in the April 9, 2010 Statement." (Suppl. Statement ¶ 10)   The Debtors' list demonstrates that any attorney-client privilege has been waived many times by numerous disclosures of the Report outside the attorney-client relationship.

### ARGUMENT

**I.**

### The Attorney-Client Privilege, To The Extent That It
### Applies To The Special Committee Report, Has Been Waived

**1.**   **The Attorney-Client Privilege**

The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981).   The privilege is found in the Federal Rules of Evidence:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege

> of a witness, person, government, State, or political subdivision
> thereof shall be determined in accordance with State law

Fed. R. Evid. 501[4].   The Fifth Circuit, in In re Grand Jury Proceedings, interpreted Fed. R. Evid. 501 by adopting a test for the application of the attorney-client privilege:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is (the) member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Proceedings, 517 F.2d 666, 670 (5th Cir. 1975).

On information and belief, the Report contains the results of the Special Committee's investigation into the allegations raised in the Defendants' October 2008 Demand Letter.   On information and belief, counsel for the Special Committee interviewed individuals inside and outside of DMT, and reviewed DMT documents, before committing its findings and conclusions to writing.   Aside, possibly, from interviews between the Special Committee members – the client – and the Special Committee's counsel, it is questionable whether any of the information in the Report is subject to the attorney-client privilege.

---

[4] In general, the law of the state that supplies the rule of decision applies to questions of the applicability of the attorney-client privilege.   Willy v. Administrative Review Bd., 423 F.3d 483, 495 (5th Cir. 2005).   In federal question cases, the federal common law of privileges applies. Id.   In this case, the analysis does not change whether the Court applies federal common law, Texas law, or Delaware law.

Part (3) of the Fifth Circuit test applies the attorney-client privilege if there is a communication between the lawyer and the client that relates to a "fact of which the attorney was informed . . . by his client" for the purpose of obtaining a legal opinion or other legal services.  The Report is considered a communication between the Special Committee (the client) and the Special Committee's counsel (the attorney), but without seeing the Report, it is impossible for the Defendants to determine whether the Report relates to facts transmitted from the Special Committee to its counsel, and if the Report is considered a legal opinion or other legal services.  Given the nature of the Report, however, it seems unlikely that much of the Report relates to facts "of which the attorney was informed by his client."  The likelier scenario is that the vast majority of facts in the Report came from the numerous interviews that the Special Committee's counsel conducted with individuals outside of the Special Committee, and even outside of DMT.[5] Although the attorney-client privilege protects communications with a lawyer for the purpose of obtaining legal services, it does not protect the facts or evidence underlying those legal services.  See Navigant Consulting, Inc. v. Wilkinson, 220 F.R.D. 467, 475 (N.D. Texas 2004) (holding that meeting minutes in which hiring and compensation were discussed were not legal advice and not protected by the attorney-client privilege).

---

[5] Included among the Special Committee's interviewees were two of the principals of FLI Deep Marine LLC, one of the Defendants.  During that interview, the Special Committee's counsel also discussed with Defendants and their counsel the status of the investigation and certain facts the investigation had revealed.  Such discussion serves as a waiver of the attorney-client privilege, at least with respect to the topics that were discussed at the interview.

The Defendants expect that the Debtors will address these points in their brief, because, as discussed below, the burden of proof is on the Debtors to show the applicability (and non-waiver) of the attorney-client privilege.  For the remainder of this Memorandum, the Defendants will assume – for purposes of the Memorandum only – that the privilege initially applied to the Report.  In that case, the Defendants are still entitled to receive a copy of the Report because, pursuant to (4)(b) of the In re Grand Jury Proceedings test, in order to assert the attorney-client privilege, the client must not have waived the privilege.  When the client (the Special Committee) disclosed the Report and its findings to the Debtors' board of directors[6], and when it widely disseminated the Report including to adverse parties and those that were the subject of the investigation, the client waived any right to assert the attorney-client privilege in connection with the Report.

---

[6] As best the Defendants understand the events (after almost two years of litigation), the lineup of the DMT board that appointed the Special Committee was only in place for approximately ten days.  Messrs. Gilman, Lenig, and McKim were the members of the DMT board when, on October 3, 2008, they appointed Messrs. Erickson, Abadie, DePalma and Candies, III to the board (See Exhibit F attached hereto).  Ten days later, the newly constituted board – with Candies, Jr. joining the meeting as a "guest" – appointed Gilman and Lenig to the Special Committee and hired Greenberg Traurig – because of its connections to DMT – as the Special Committee's counsel (See Exhibit A attached hereto).  The board members who had been appointed on October 3 then apparently all resigned, because on November 3, 2008, the controlling shareholders of DMT executed a written consent that removed McKim from the board, leaving Gilman and Lenig as the members of the Special Committee, and the sole members of the DMT board (See Exhibit G attached hereto).  Perhaps others were added to the DMT board subsequent to November 3, 2008, when the Special Committee made its "recommendation to the Board in connection with the Demand" (DMT Opening Brief at 3, attached hereto as Exhibit B).  If not, the presentation made by Special Committee members Gilman and Lenig to DMT board members Gilman and Lenig would have certainly been a unique event.

9

2.    **Burden of Proof**

Under each of federal common law, Texas law, and Delaware law, the party asserting the attorney-client privilege bears the burden of proving the existence and applicability of the privilege, including that the privilege has not been waived.  See, e.g., In re Boxer Property Management Corp., 2009 WL 4250123, 2 (Tex.App.-Houston [14 Dist.] 2009); Sokol Holdings, Inc. v. Dorsey & Whitney, LLP, CIV.A. 3874-VCS, 2009 WL 2501542 (Del. Ch. Aug. 5, 2009) appeal transferred to CIV.A. 09C-08-239JAP, 2010 WL 599330 (Del. Super. Ct. Feb. 19, 2010); In re Hardwood P-G, Inc., 403 B.R. 445, 457 (Bankr. W.D. Tex. 2009); In Re BP Products N. Am. Inc., 263 S.W.3d 106, 111 (Tex. App. 2006); In re ExxonMobil Corp., 97 S.W.3d 353, 357 (Tex. App. 2003) (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding); Apex Mun. Fund v. N-Group Sec., 841 F. Supp. 1423, 1426 (S.D. Tex. 1993); Moyer v. Moyer, 602 A.2d 68, 72 (Del. 1992).

In this case, it is clearly the Debtors who are asserting the existence and applicability of the attorney-client privilege, and the burden of proving such assertions – including the assertion that the privilege has not been waived – lies exclusively with the Debtors.[7]  The Debtors' burden, however, is a fool's errand –

---

[7] The briefing schedule set by the Court required the Debtors and the Defendants to file their briefing on the attorney-client privilege issue at the same time.  As a consequence, in this Memorandum of Law the Defendants do not have the benefit of the Debtors' reasoning for why the privilege should not be considered waived.  Defendants have therefore addressed their arguments for why the privilege should be considered waived and inapplicable, but respectfully request an opportunity to respond to the Debtors' arguments, if need be.

the Debtors do not possesses the right to assert the privilege, and even if they did, the number and nature of the people who have either viewed the Report or have been offered a copy of the Report makes any claim of privilege in connection with the Report absurd.  In either event, the Report is no longer subject to the attorney-client privilege and there should be no bar to the Defendants obtaining a copy of the Report.

3.     **The Attorney-Client Privilege in Connection With the Report "Belongs" To The Special Committee, Not the Debtors**

The Debtors have asserted that they are the "owners" of the attorney-client privilege in connection with the Report.  The Debtors have further asserted that Mr. Bittner, as the Chief Restructuring Officer of the Debtors, has the authority to assert or waive the privilege on behalf of the Debtors.  See Debtors' Objection/Response to Motion of Paul McKim for Entry of Order Regarding Subpoena, ¶ 5.  Defendants agree that if the Debtors were the "owners" of the attorney-client privilege in connection with the Report, Mr. Bittner – as the chief restructuring officer of the Debtors – would have the authority to assert and/or waive the privilege.  The Debtors, however, are working from a faulty assumption. Namely, that the privilege is the Debtors' to waive.  In fact, the privilege in connection with the Report belongs to the Special Committee that produced the Report, or at whose direction the Report was produced.

It is self-evident that any attorney-client privilege in connection with the Report is between the attorney (Greenberg Traurig[8]) and the client (the Special Committee).  On October 13, 2008, the full board of directors of DMT authorized the creation of the Special Committee.  The Special Committee had the authority to hire its own counsel and to conduct the investigation as it saw fit without any interference from the DMT board.   At the conclusion of the investigation, the Special Committee would report to the full DMT board "as to the allegations in the Shareholder Demand Letter, the conclusions as to the impact on the Company and its operations, and any recommendations as to actions to be taken" (Exhibit A, ¶ 9).   Prior to the bankruptcy stay, while the underlying action – in which the Defendants sued DMT and certain then-current and former officers, directors, and controlling shareholders of DMT – was pending before the Delaware Chancery Court, the Debtors asserted on multiple occasions that the Special Committee was independent and disinterested.   See, e.g., DMT Opening Brief at 11 (attached hereto as Exhibit B).

Courts that have considered the question of whether a company can assert or waive the attorney-client privilege in connection with a report prepared at

---

[8] Greenberg Traurig represented the Special Committee and, on various occasions, DMT. This somewhat muddies the analysis of the attorney-client privilege in connection to the Report, but it would be an unfortunate outcome if the Court found that the Debtors actually "owned" the privilege because the Special Committee did not follow best practices and hire its own, independent, counsel.   In fact though, in cases where a special committee is represented by the same counsel as the company as a whole, courts have found that "the attorney-client privilege would not bar discovery of all communications between counsel and the" special committee.  Weiser v. Grace, 179 Misc. 2d 116, 683 N.Y.S.2d 781, 786 (N.Y. Sup. Ct. 1998).

the direction of a committee of the company's board have consistently held that the privilege belongs to the committee and cannot be waived by the company's board of directors or a bankruptcy trustee.   See, e.g., In re BCE W., L.P., M-8-85, 2000 WL 1239117 (S.D.N.Y. Aug. 31, 2000) (holding that the special committee had a separate identity from the board and management and that any legal advice provided to the special committee in connection with the performance of its duties were privileged, but that such privilege belonged to the special committee and could not be waived by the board or a bankruptcy trustee); Commodity Futures Trading Com'n v. Weintraub, 471 U.S. 343, 357 (1985) (bankruptcy trustee has the authority to assert or waive the attorney-client on behalf of the bankrupt company, but only as to privileges "owned" by the company); S.E.C. v. Roberts, 254 F.R.D. 371, 377 (N.D. Cal. 2008) (when a special committee is created and has its own counsel, the special committee is the client for purposes of attorney-client privilege, and not the board of directors).   In fact, even when a special committee makes a presentation of its findings to the board of directors that appointed the special committee, the special committee is considered to have waived its attorney-client privilege in connection with the presentation and any documents underlying the presentation.   See In re OM Group Sec. Litig., 226 F.R.D. 579 (N.D. Ohio 2005).

It is clear, therefore, that the Report is owned by the Special Committee, and that only the Special Committee – not the full board of directors,

not the controlling shareholders, and not Mr. Bittner – has the authority to assert or waive the attorney-client privilege in connection with the Report.

**4.    Even If The Report Is Privileged, Privilege Was Waived By The Widespread Dissemination of the Report and its Conclusions**

Even if the Court determines that the Report was initially entitled to the protections of the attorney-client privilege, and even if the Court determines that the Debtors – as opposed to the Special Committee – have the authority to waive or assert the privilege, such privilege has clearly been waived.  In addition to Messrs. Gilman and Lenig, who together comprised the entire Special Committee, no fewer than 27 people have been provided with a copy of the Report.  Many of those individuals are either adverse to the Debtors in litigation, or are the subjects of the investigation and Report and therefore potentially adverse to the Debtors. Furthermore, on information and belief the Report is available to anyone who asks for a copy from the court clerk in Harris County, Texas. [9]  It would certainly be an unusual outcome if any person was able to obtain a copy of the Report merely upon request to the Harris County court, but the Defendants were not permitted to do so.  Under those circumstances, it is inconceivable how the Debtors can claim that the Report is privileged and must be withheld from the Defendants, who were the parties that initially demanded the formation of the Special Committee.

---

[9] On information and belief, from October 12, 2009, the date on which the Special Committee's counsel filed the Report with the Harris County, Texas court, the Report has been available upon request from that court's clerk.  The Defendants have been aware of the availability of the Report for some time, yet have not attempted to obtain a copy of the Report from the Harris County court due to the bankruptcy stay and apprehension that even a request to the Harris County court for the publicly available Report would be perceived by the Debtors and/or this Court as a violation of the stay.

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit…. The attorney-client privilege is not designed for such tactical employment.

Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1425 (3rd Cir. 1991).

The Debtors bear the burden of proof to show that (a) they are the owners of the privilege and (b) that the privilege has not been waived.  Due to the briefing schedule and the fact that the Defendants may not have an opportunity to respond to the Debtors arguments, the following is the Defendants' preemptive analysis of the various disclosures of the Report made by the Special Committee and the Debtors, and the reasons why such disclosures resulted in the effective waiver of the attorney-client privilege, no matter to whom that privilege initially belonged.

a.   **DMT's Board of Directors**

When a company's board of directors appoints a special committee to investigate allegations, and that special committee – or counsel retained by such special committee – prepares an investigative report that meets the requirements to establish the attorney-client privilege, such privilege is "owned" by the special committee, not the board or the company. See In re BCE West, L.P.; Commodity Futures Trading Comm'n, 471 U.S. 343; S.E.C. v. Roberts, 254 F.R.D. 371; In re OM Sec. Litig., 226 F.R.D. 579.  If the special committee then presents the report's findings to the full board of directors, the attorney-client privilege is

waived.  See In re OM Sec. Litig., 226 F.R.D. 579.   Therefore, if the Special Committee presented the Report to the board of the Debtors, the privilege would be waived.[10]

**b.      Debtors' Bankruptcy Counsel and
John Bittner, Chief Restructuring Officer of the Debtors**

As is discussed above, any attorney-client privilege that was attached to the Report was "owned" by the Special Committee, not the Debtors.  Therefore, any disclosure of the Report to Mr. Bittner acted as a waiver of the attorney-client privilege.  See In re BCE W., L.P., 2000 WL 1239117 (holding that any attorney-client privilege related to legal advice provided to the special committee in connection with the performance of its duties belonged to the special committee and could not be waived by the bankruptcy trustee); Commodity Futures Trading Comm'n, 471 U.S. at 357 (bankruptcy trustee has the authority to assert or waive the attorney-client on behalf of the bankrupt company, but only as to privileges "owned" by the company).  Likewise, the disclosure of the Report to the Bracewell Giuliani lawyers – Ms. Kurtz, Mr. Cohen, Ms. Venta, and Mr. Wood – acted as a waiver of the privilege held by the Special Committee, because the Bracewell lawyers do not represent the Special Committee, but rather the Debtors.

Therefore, the disclosures to Mr. Bittner and the Debtors' bankruptcy counsel acted as a waiver of the Special Committee's privilege and should bar the Debtors from preventing disclosure of the Report to the Defendants.

---

[10] As was discussed previously, it is unclear if the "full board of the Debtors" included anyone other than the members of the Special Committee, Messrs. Gilman and Lenig.

###### c.   Hugh Massey Ray, III, Counsel to
###### the Committee of Unsecured Creditors

According to the Debtors' Supplemental Statement, the Debtors provided a copy of the Report to Mr. Ray of McKool Smith P.C., counsel to the Committee of Unsecured Creditors (the "Creditors Committee"), and Mr. Ray provided a copy of the Report to "certain McKool Smith employees" (Suppl. Statement at 5). For the reasons discussed above in connection with the disclosure of the Report to Mr. Bittner and the Debtors' bankruptcy counsel, the disclosure to Mr. Ray acts as a waiver of the Special Committee's attorney-client privilege.

The Debtors assert that the Report was given to Mr. Ray under a confidentiality agreement and a joint prosecution/defense agreement between the Creditors Committee and the Debtors. Suppl. Statement at 5. As a result of those agreements, the disclosure of the Report to Mr. Ray *may* not have acted as a waiver of the privilege if the privilege was in fact held by the Debtors[11]. But, as was discussed previously, the Debtors did not hold the attorney-client privilege related to the Report. That privilege was held by the Special Committee, and therefore if the disclosure of the Report <u>to</u> the Debtors acted as a waiver of the privilege, then *a fortiori* the disclosure of the Report <u>by</u> the Debtors to the Creditors

---

[11]  If the Debtors held the attorney-client privilege, the existence of the joint defense agreement between the Debtors and the Creditors Committee may have acted to preserve the attorney-client privilege. The confidentiality agreement, however, would have done no such thing. <u>See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.</u>, 293 F.3d, 296 (holding that any disclosure of protected communications, even pursuant to a confidentiality agreement, acts as a waiver of the attorney-client privilege).

Committee acted as a further waiver of the attorney-client privilege the Special Committee held in connection with the Report.

Therefore, when the Debtors provided a copy of the Report to Mr. Ray and the Creditors Committee, it acted as a waiver of the attorney-client privilege that the Special Committee previously held in the Report.

### d.   Production of the Report in the Harris County Litigation

On October 12, 2009, a motions hearing was held in the Harris County case.  In the course of that hearing, part of which related to the question of whether the Report would be produced to the plaintiff in that case – Mr. McKim and his counsel – the Harris County court imposed a protective order on the production of the Report to Mr. McKim.  The court imposed the protective order based on DMT's refusal to produce a copy of the Report to Mr. McKim and his counsel in the absence of such an order or a restrictive confidentiality agreement. (Motions Hearing Transcript, 29:12, attached hereto as Exhibit C).  Pursuant to the protective order, a copy of the Report was given to Mr. McKim and his counsel. Yet not two and a half hours later, at the same hearing, the Special Committee's counsel introduced a copy of the Report into evidence.  The Harris County court, understandably confused at this turn of events – whereby counsel for the Special Committee would only produce a copy of the Report to Mr. McKim subject to a confidentiality agreement or protective order, yet was ready to introduce the Report in open court with no protections as to the Report's disclosure – asked the Special Committee's counsel:

> **THE COURT:** I have an additional question for Mr. Battaglini. You wanted a protective order before you gave [the Report] to them. Now you want to introduce it into evidence? That's going to be part of public record.

Motions Hearing Transcript, 125:2.  The Special Committee's counsel replied:

> **MR. BATTAGLINI:** Your Honor, we initially provided it to you under seal because plaintiffs had not yet received a copy. And we were careful up to that point in deciding whether or not it should become a public record, given the absence of the signature on the agreed protective order.
>
> Now that the ruling has been made, and now that they -- now that the plaintiffs have a copy, it becomes integral to our motion for the recovery of fees to have the witness be able to speak from the report, and particularly regarding the conclusions reached. We know of no other way of doing that but to make the report an exhibit.

Motions Hearing Transcript, 125:7 (emphasis added).   Counsel for the Special Committee – who was admitted to practice in Texas and was well aware of the consequences of submitting the Report as an exhibit in open court – after fighting the disclosure of the Report absent a severe confidentiality agreement or a protective order, voluntarily submitted the Report to the court as an exhibit, knowing that it would potentially be available to anyone making a request of the Harris County court clerk or the court reporter.

Any disclosure of attorney-client communications to a third party lacking a common legal interest with the client will result in a waiver of the attorney-client privilege. S.E.C. v. Brady, 238 F.R.D. 429, 439 (N.D. Tex. 2006). Likewise, "any privileged information revealed during the course of an adversarial proceeding loses its special protection forever" Republic of Philippines v.

19

Westinghouse Elec. Corp., 132 F.R.D. 384, 390 (D.N.J. 1990) (quoting In re Chrysler Motors Corporation Overnight Evaluation Program Litigation, 860 F.2d 844 (8th Cir.1988)).   The fact that the Report was given to Mr. McKim under a protective order is irrelevant to the determination of whether the privilege applies. "[E]ven if the disclosing party requires, as a condition of disclosure, that the recipient maintain the materials in confidence, this agreement does not prevent the disclosure from constituting a waiver of the privilege; it merely obligates the recipient to comply with the terms of any confidentiality agreement" In Re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 296 (6th Cir. 2002) (holding that any disclosure of protected communications, even pursuant to a confidentiality agreement, acts as a waiver of the attorney-client privilege).   The Defendants are not aware of any circumstances under which the submission of the Report as an exhibit in an open court proceeding where the exhibit would afterward be freely available from the court's clerk would not constitute a waiver of the attorney-client privilege.

Therefore, as a result of the disclosure of the Report in a court proceeding, the submission of the Report as an exhibit in that proceeding, and even the production of the Report to McKim under a court imposed protective order, any attorney-client privilege that had existed in connection with the Report was thereby waived.

###### e.     Richard A. Lesser

Mr. Lesser, counsel to Deepworks, Inc. – another minority investor and Defendant in this adversary action – received a copy of the Report after he signed an extremely restrictive confidentiality agreement that included a provision restricting the Report to "attorneys eyes only."[12]   As the Defendants have previously shown, any disclosure of protected communications – even if the disclosure is made pursuant to a confidentiality agreement – acts as a waiver of the attorney-client privilege.  In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d at 296.   Therefore, by providing Mr. Lesser with a copy of the Report, the Special Committee waived its privilege and lost any power to prevent the Defendants from obtaining a copy of the Report.

###### f.     Disclosure of the Report to the Subjects of the Investigation

Included on the final list of recipients of the Report in the Supplemental Statement are John Ellingboe and his attorney.  The Debtors assert that Mr. Ellingboe was provided with his copy of the Report in the Harris County case, under the court's protective order.  The production of the Report to Mr.

---

[12] At the same time that the Special Committee's counsel offered the Report to Mr. Lesser, counsel also offered a copy of the Report to the FLI Defendants under similar restrictions. Despite extensive negotiations – conducted by the Special Committee and DMT's joint counsel at the same time it was presumably assisting in preparing DMT's bankruptcy petition – the parties could not agree to a confidentiality Agreement because the only version acceptable to the Special Committee's counsel was much more restrictive than necessary or appropriate, including restrictions on the FLI Defendants' attorneys sharing the Report with the FLI Defendants.  Without the context and institutional knowledge of the Debtors possessed by the FLI Defendants, both the FLI Defendants and their counsel decided that under those circumstances the Report would not be very useful and refused to sign the agreement.  The parties were preparing to make their arguments to the Delaware court regarding the production of the Report when the Debtors filed their Suggestion of Bankruptcy in that court.

Ellingboe and his attorney, however, is subject to the same issues as the production of the Report to the other numerous recipients.  Any disclosure of the Report to a third party lacking a common legal interest with the client acts as a waiver of the privilege, even if the disclosure is made pursuant to a confidentiality agreement.  See In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d at 296.  See also S.E.C. v. Brady, 238 F.R.D. at 439 (disclosure of attorney-client communications to a third party lacking a common legal interest will result in a waiver of the attorney-client privilege); Apex Mun. Fund, 841 F. Supp. at 1426; Hodges, Grant & Kaufmann v. United States Government, 768 F.2d 719, 720-21 (5th Cir.1985).

Furthermore, the disclosure of the Report to Mr. Ellingboe and his counsel is perhaps more troubling than some of the other disclosures, because Mr. Ellingboe was actually a subject of the investigation.  Although the basic privilege waiver analysis does not require any more information that the fact that Mr. Ellingboe was a third party who received privileged information, the fact that Mr. Ellingboe was also a target of the investigation makes it crystal clear that the confidentiality of the Report was not a prime objective of either the Special Committee or the Debtors.

### g.   **Nasser Kazeminy's Numerous Lawyers**

Nasser Kazeminy[13] is the controlling shareholder of DMT, and is at the center of the allegations made in the Defendants' Demand Letter to DMT.  But Mr. Kazeminy was not a member of the Special Committee, and his attorneys were not the attorneys for the Special Committee, so without any further analysis, any disclosures of the Report to Mr. Kazeminy or his attorneys acts as a waiver of the attorney-client privilege.

Five attorneys purport to have represented Mr. Kazeminy in the Harris County case, according to the final list of Report recipients included in the Debtors' Supplemental Statement. (Suppl. Statement at 5 – 6).  From the court filings and the service lists for distribution of pleadings in the Harris County case (several examples attached hereto as Exhibit D), it appears that at most three of those attorneys represented Mr. Kazeminy in the Harris County case, and certainly no more than three of the attorneys were in the Harris County courthouse on the date that the Special Committee's counsel submitted the Report into the public record.[14]

---

[13] Although Mr. Kazeminy is the controlling shareholder of the Debtors and one of its largest creditors, and was the main focus of the serious allegations in the Defendants' Demand Letter, Mr. Kazeminy has refused to accept service of a subpoena to sit for a deposition in this case.  The federal rules require personal service of the subpoena, and Mr. Kazeminy and his attorneys have refused to accept service.   Therefore, the Special Committee's interview of Mr. Kazeminy may be the Defendants' only opportunity to learn any of the facts regarding Mr. Kazeminy's purchases of DMT stock from minority shareholders, and any promises Mr. Kazeminy made in connection with his purchase (or proposed purchase) of DMT stock.

[14] The three attorneys who clearly represented Mr. Kazeminy in the Harris County case were the attorneys from Weinstine & Winthrop.   In addition to Mr. Kazeminy, the Weinstine & Winthrop attorneys represented Daniel Erickson, Eugene DePalma, John Hudgens, NJK Holdings Corporation, and DCC Ventures, LLC,  "all entities or individuals named as alleged wrongdoers and/or defendants in the Demand Letter, the Delaware

On information and belief there is no record of Louie J. Freeh or Joseph S. Friedberg ever appearing on Mr. Kazeminy's behalf in the Harris County case, and neither Mr. Freeh nor Mr. Friedberg ever had his name on any filing with the Harris County court in that case.  Neither Mr. Freeh nor Mr. Friedberg was in the Harris County court on the day the Special Committee's counsel submitted the Report into evidence.

Therefore, the Defendants question the assertion that the Report was produced to each of Mr. Freeh and Mr. Friedberg "under a protective order of the court." (Suppl. Statement at 5) The Defendants further question the applicability of the court's protective order to Mr. Freeh or Mr. Friedberg.  But, ultimately, it is of no consequence, because the disclosures to Mr. Freeh and Mr. Friedberg act as additional waivers of the attorney-client privilege.  They are third parties who – along with their client – lack a common legal interest with the Special Committee.  Mr. Kazeminy was a target of the investigation, and was intimately involved in just about every allegation made by the Defendants in their Demand Letter.  Under the same analysis used for many of the other recipients of the Report above, the disclosure of the Report to Mr. Kazeminy's counsel – including his counsel that did appear in the Harris County case, the lawyers from Weinstine & Winthrop, P.C. –

---

Litigation and/or the Harris County Litigation" (Suppl. Statement at 5).  Like Mr. Ellingboe, all these individuals and entities were the subjects of the Special Committee investigation that led to the Report and had, at least potentially, divergent legal interests from the Special Committee or the Debtors.  Under those circumstances, there was no need for their counsel to have a copy of the Report, and the disclosure of the Report to the Weinstine & Winthrop attorneys clearly acted as a waiver of any attorney-client privilege.

acts as a waiver to the extent there was any attorney-client privilege protecting the Report.

### h.   Otto Candies and Counsel

On the final list of recipients of the Report contained in the Supplemental Statement, Otto Candies, III[15] was listed, as well as attorneys representing Mr. Candies, III and his father, Otto Candies, Jr.   Mr. Candies, III is listed in the Supplemental Statement as a defendant in the Harris County litigation. Using the now-familiar analysis used above with the other recipients of the Report, it is clear that production of the Report to Mr. Candies, III and to the attorneys representing him and his father, acted as a waiver of any privilege that existed. Mr. Candies, III and Mr. Candies, Jr. are controlling shareholders of the Debtors who, along with Mr. Kazeminy, played the largest role in the events that led to the call for an investigation by the Special Committee.   Depending on the conclusions of the Report and the underlying facts, the two Mr. Candies may very well end up legally adverse to the Special Committee and the Debtors.   Although the Debtors assert that the Candies received their copy of the Report "under a protective order of the court," the Defendants have already demonstrated that such protective order – while perhaps limiting the disclosure of the Report by those who received it under such protective order – did not preserve any attorney-client privilege that existed.

---

[15] Mr. Candies, III was at one time a director of DMT.   On information and belief, his tenure as a director lasted less than one month, and ended after he and his fellow directors appointed the Special Committee.   Therefore, Mr. Candies, III was neither a director at the time the Special Committee conducted its investigation, nor at the time the Report was issued or given to him.

As a result, the disclosures to Mr. Candies, III and to the attorneys representing him and his father acted as a waiver of the attorney-client privilege, to the extent such a privilege existed prior to the disclosures.

### i.    June 30, 2009 Press Release

On June 30, 2009, DMT issued a press release announcing the conclusion of the Special Committee's investigation.[16]   The press release gave numerous details of the investigation – the appointment of the Special Committee, the number of witnesses interviewed, the volume of documents reviewed – and the Special Committee's conclusion that

> all of the allegations regarding the Company as set forth in the Demand Letter dated October 10, 2009 sent by FLI Deep Marine LLC and others, the Complaint filed by FLI and Bressner Partners Ltd. in the Chancery Court of Delaware in Civil Action No. 4138-VCN, and the First Amended Petition filed by Paul McKim in Harris County, Texas in Cause No. 2008-64385, are without merit.   The Special Litigation Committee further concluded that there is no evidence to support any of the allegations that, with the exception of Paul McKim, the former CEO of DMT and DMH, either the Company or any of its current and former officers, directors or major shareholders engaged in waste, fraud, gross mismanagement or made improper payments, directly or indirectly, to an elected official or family member.
>
> As a result of the investigation and the committee's determination, the Company declines to bring or take up a lawsuit against its current or former officers, directors, and major shareholders based upon those allegations. One of the lawsuits, originally brought before the Chancery Court in Delaware, has already been dismissed[17], and the Company will

---

[16] A copy of the June 30, 2009 press release is attached hereto as Exhibit E.

[17] Although the Delaware Chancery Court was dismissed, it was dismissed in order to give the Special Committee sufficient time to conduct its investigation, with the Chancery Court understanding that the Defendants (plaintiffs in the Chancery Court proceeding) would have another chance to file suit against DMT after the Special Committee concluded its

be promptly moving to dismiss each of the causes of action in the remaining Texas litigation brought against it by Paul McKim.

Press Release at 1 (footnote added).

The June 30 press release acted as a waiver of the attorney-client privilege that had attached to the Report.  "A party can't selectively chose [sic] which portions of a document to release to the public and which portions it wishes to assert a privilege." Krenning v. Hunter Health Clinic, Inc., 166 F.R.D. 33, 35 (D. Kan. 1996) (holding that the attorney-client privilege and the work-product rule were waived based, in part, on a press release that had been issued).  The Special Committee did not just state that its investigation had concluded and no wrongdoing was found.  The Special Committee went into detail about its investigative methods and its conclusion that there may have been wrongdoing, but that such wrongdoing was limited to Paul McKim, DMT's founder and former CEO and Chairman.[18]  The Special Committee, by choosing to selectively release information about those parts of the Report that are favorable to DMT, has waived its right to use the attorney-client privilege or work-product doctrine to prevent the Defendants from seeing the entirety of the Report, in its proper context.

---

investigation.  In reality, the day after the Special Committee issued its press release, the Defendants were notified that DMT had consummated a short form merger and that the Defendants DMT shares would be terminated.

[18] It is beyond the scope of this Memorandum, but the Special Committee's press release begs the question why action was not taken by DMT against Mr. McKim if the Special Committee had reason to believe Mr. McKim "engaged in waste, fraud, gross mismanagement or made improper payments, directly or indirectly, to an elected official or family member."

## II.

### The Work-Product Doctrine, To The Extent That It Applies To The Special Committee Report, Has Been Waived

In the various discussions of the Report in this Court, as well as in the Delaware courts, the Debtors have consistently maintained that the Report is subject to the attorney-client privilege.  The Debtors have never mentioned the work-product doctrine.  Furthermore, the Court had only requested briefing of the attorney-client privilege issue.  Nevertheless, the Defendants anticipate that when the Debtors realize that the attorney-client privilege is unavailable to them in connection with the Report (for all the reasons discussed above), they will attempt to argue that disclosure of the Report to the Defendants is protected by the work-product doctrine.  However, for many of the same reasons the attorney-client privilege argument failed – and for a few additional reasons – the work-product doctrine does not protect the Report or prevent its disclosure to the Defendants.

### 1.   Work-Product Doctrine

The work-product doctrine protects the notes, mental impressions, and legal analyses and conclusions that are prepared by an attorney in anticipation of litigation.  See Fed. R. Civ. P. 26(b)(3); In re Grand Jury Proceedings, 601 F.2d 162, 171 (5th Cir. 1979); S.E.C. v. Brady, 238 F.R.D. 429, 441 (N.D. Tex. 2006).

> [U]nlike the attorney-client privilege, work-product protection is not necessarily waived by disclosure to a third party who does not have a common legal interest. Disclosure of work-product can result in waiver of the work-product protection, but only if it is disclosed to adversaries or treated in a manner that substantially increases the likelihood that an adversary will come into possession of the material.

Robinson v. Texas Auto. Dealers Ass'n, 214 F.R.D. 432, 443 (E.D. Tex. 2003)

vacated in part sub nom. In re Texas Auto. Dealers Assn., 03-40860, 2003 WL

21911333 (5th Cir. July 25, 2003) (citations omitted).   For many of the same

reasons discussed above, the work-product protection – to the extent it applied to

the Report at all – has been waived by the numerous disclosures of the Report to

adversaries and potential adversaries.

**2.     Standard for Applicability of Work-Product Doctrine and Burden of Proof**

The burden of proof is initially on the party asserting the work-product

protection to establish that

> (1) the materials sought are documents or tangible things; (2)
> the materials sought were prepared in anticipation of litigation
> or for trial; (3) the materials were prepared by or for a party's
> representative; (4) if the party seeks to show that the material
> is opinion work product, that party must show that the material
> contains the mental impressions, conclusions, opinions, or legal
> theories of an attorney or other representative of a party.

S.E.C. v. Brady, 238 F.R.D. at 441.   If the Debtors meet their burden and prove

that the Report warrants protection under the work-product doctrine, the burden

then shifts to the Defendants to prove why the Report should still be produced.   Id.

The Defendants can then satisfy their burden by either showing (i) a compelling

need for the Report and undue hardship in obtaining it or (ii) that the work-product

protections have been waived.   S.E.C. v. Brady, 238 F.R.D. at 429; In re Int'l

Systems & Controls Corp. Sec. Litig., 693 F.2d 1235, 1240 (5th Cir.1982).

It is clear from the history of this case that to say that the Defendants

met "undue hardship in obtaining" a copy of the Report is an understatement.   The

Defendants also believe – and have asserted before this Court on multiple occasions – that they have a compelling need for the Report which may contain critical evidence pertaining to Defendants' direct claims against the majority shareholders, as well as derivative claims.  In any event, it is unnecessary for the Defendants to show they have a compelling need for the Report, because the work-product protections that relate to the Report have clearly been waived.

**3.    The Work-Product Protection in Connection With the Report "Belongs" To The Special Committee, Not the Debtors**

Although the attorney-client privilege and the work-product doctrine provide different protections to materials produced for clients, they have in common the requirement that the protection may be invoked only by the "client." By asserting that the Report is protected by the attorney-client privilege and that Mr. Bittner could waive such privilege, the Debtors are implicitly asserting that they are the client for purposes of invoking the attorney-client privilege.  But as discussed above in the context of the attorney-client privilege, the actual client on whose behalf the Report was prepared was the Special Committee.  <u>See</u> Restatement (Third) of the Law Governing Lawyers § 90 (2000) ("Work-product immunity may be invoked by or for a person on whose behalf the work-product was prepared").

Therefore, it is the Special Committee that would have the right to invoke the protections of the work-product doctrine, not the Debtors or Mr. Bittner. Nevertheless, even if the work-product doctrine applies in this scenario, and even if Mr. Bittner or the Debtors had the right to invoke or waive the work-product

protections, the Report is no longer protected by the work-product doctrine because the course of conduct by both the Special Committee and the Debtors has resulted in a waiver of those work-product protections.

**4.      Even If The Report Is Considered Work Product, The Doctrine Was Waived By The Widespread Dissemination of the Report and its Conclusions**

Even if the Court determines that the Report was initially covered by the work-product doctrine, the Special Committee's and the Debtors' wide dissemination of the Report – to seemingly everyone other than the Defendants – effectively waived the right to invoke those protections and to deny the Defendants a copy of the Report.

"Waiver of work product protection only results if the work product is disclosed to an adversary or treated in a manner that substantially increases the likelihood that an adversary will come into possession of that material" S.E.C. v. Brady, 238 F.R.D. at 444; Ferko v. National Ass'n for Stock Car Auto Racing, Inc., 218 F.R.D. 125, 136 (E.D. Tex. 2003).  This is true even if the work-product is disclosed to an adversary pursuant to a confidentiality agreement. S.E.C. v. Brady, 238 F.R.D. at 444; Republic of Philippines, 132 F.R.D. at 390.  Notwithstanding the confidentiality agreement, the fact is that the disclosure of work-product to an adversary is objectively a breach of confidentiality.  See S.E.C. v. Brady, 238 F.R.D. at 444; Chubb Integrated Sys. Ltd. v. Nat'l Bank of Wash., 103 F.R.D. 52, 67-68 (D.D.C.1984).

The Defendants do not intend to repeat the lengthy analysis of each instance of disclosure of the Report that was done above in connection with the

attorney-client privilege.  It is, however, abundantly clear from that analysis that the Report should not enjoy protection as work-product.  The Report has been disclosed and produced on numerous occasions to adversaries or potential adversaries of the Special Committee and the Debtors.  These include the subjects of the investigation in connection with which the Report was initially drafted; the plaintiff in the Harris County case (Mr. McKim); a plaintiff in an action against the Debtors in Delaware Chancery Court as well as a defendant in the current adversary action (Deepworks, Inc.); and apparently the general public as a result of the entry of the Report into the public record in the Harris County case.  None of these disclosures is consistent with the notion of protecting the confidentiality of an attorney's work-product.

Therefore, the Court must reject any assertion by the Debtors or the Special Committee that the Report should continue to enjoy work-product protections and that those protections can be used as a shield to prevent disclosure of the Report to the Defendants.

III.

<strong><u>Selective Waiver Does Not Apply</u></strong>

Selective waiver is a doctrine that states that a client can waive the attorney-client privilege or the work-product doctrine in limited circumstances, while still retaining the power and authority to assert the privilege or protection in other circumstances.  It typically comes up in connection with government investigations, when a company seeks to cooperate with the government without

waiving its attorney-client privilege or work-product protections.  Selective waiver has been rejected however, by virtually every federal circuit that has considered it, and the Fifth Circuit is no different.   Therefore, any disclosures – even to government investigators – can be considered a complete waiver of the attorney-client privilege or work-product protections.

> The doctrine of "selective waiver" was originally advanced by the Eighth Circuit, and only in the case of the attorney client privilege, not the work product immunity . . . As a review of federal circuit case law has indicated, there is but one circuit that has applied the selective waiver doctrine to attorney-client material. All other circuits addressing the matter have refused to apply the doctrine. In the context of non-opinion work product, no circuit has adopted selective waiver and five circuits have rejected the doctrine . . . The only conclusion from the federal case law is that the federal circuits have not expanded either the attorney-client privilege under Federal Rule of Evidence 501 or the non-opinion work-product doctrine under Fed.R.Civ.P. 26(b)(3) . . . by applying selective waiver.

In re Qwest Communications Intern. Inc., 450 F.3d 1179, 1196 (10th Cir. 2006). See also In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d at 302-07 (holding that defendant waived its privilege and work-product immunity); United States v. Mass. Inst. of Tech., 129 F.3d 681, 684-88 (1st Cir. 1997) (finding waiver of privilege and work-product immunity); In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) (finding waiver of work-product immunity where there was no confidentiality agreement with the SEC); Westinghouse Elec. Corp., 951 F.2d at 1423-31; (finding waiver of privilege and work-product immunity); In re Martin Marietta Corp., 856 F.2d 619, 623-26 (4th Cir. 1988) (finding waiver of privilege and tangible work-product, but not opinion work-

product); Permian Corp. v. United States, 665 F.2d 1214, 1219-22 (D.C. Cir. 1981) (finding waiver of attorney-client privilege); In re Syncor ERISA Litig., 229 F.R.D. 636, 645-46 (C.D. Cal. 2005) (rejecting attorney-client privilege and work-product immunity claims); McMorgan & Co. v. First Cal. Mortgage Co., 931 F. Supp. 703, 707-10 (N.D. Cal. 1996) (finding waiver of privilege and work-product when documents were given to Department of Labor); McKesson HBOC, Inc. v. Superior Court, 115 Cal. App. 4th 1229, 9 Cal. Rptr. 3d 812, 819-21 (Cal. Ct. App. 2004) (finding waiver of privilege and work-product); McKesson Corp. v. Green, 610 S.E.2d 54, 56 (Ga. 2005) (agreeing with lower court that defendant waived work-product immunity); State v. Thompson, 306 N.W.2d 841, 843 (Minn. 1981) (finding "no occasion" to apply selective waiver and suppress testimony where client waived privilege through disclosure of investigative reports, notes and statements to Attorney General and grand jury).

The rejection of the "selected waiver" doctrine by the federal courts makes sense, given the objectives of the attorney-client privilege and the work-product doctrine.

> First, selective waiver does not foster full and frank communications between a client and its attorney, which is one of the principal reasons for recognizing the attorney-client privilege . . . Second, selective waiver transforms the privilege into just another tactical weapon in litigation. Third, and with respect to the idea that a confidentiality agreement legitimizes selective waiver, it is important to remember that the attorney client privilege derives from the common law.  "It is not a creature of contract, arranged between parties to suit the whim of the moment."

Douglas R. Richmond, <u>The Case Against Selective Waiver of the Attorney-Client Privilege and Work Product Immunity</u>, 30 Am. J. Trial Advoc. 253, 265 (2006) (quoting <u>In re Columbia/HCA Healthcare Corp. Billing Practices Litig.</u>, 293 F.3d at 303).

It is therefore clear that the selective waiver doctrine does not apply to any of the disclosures of the Report made by the Special Committee or the Debtors, and that any waiver of the attorney-client privilege or the work-product protections acted as a full waiver of those protections, such that the Special Committee and the Debtors are unable to re-assert any claims to such protections.

<u>Conclusion</u>

For the reasons discussed above, the Court should find that the Special Committee waived any right it had to assert the attorney-client privilege or the work-product doctrine, and that as a result of such waivers, there is no longer any good reason to deny the Defendants a copy of the Report.  The Court should therefore order the Debtors to immediately provide the Defendants with a copy of the Report.

Dated:   May 21, 2010

Respectfully submitted,

PADUANO & WEINTRAUB LLP


By: /s/ Anthony Paduano
　　　Anthony Paduano

1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100
ap@pwlawyers.com

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 21, 2010, a true and correct copy of the foregoing document was served on all parties on the attached service list by electronic means as listed on the court's ECF noticing system.


_/s/ Jason Snyder_____
Jason Snyder