

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
06/13/2011**

| | | |
|---|---|---|
| IN RE: | § | |
| **DEEP MARINE HOLDINGS, INC.,** *et al*, | § | **Case No. 09-39313** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **DEEP MARINE HOLDINGS, INC.,** *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **Adversary No. 10-3026** |
| | § | |
| **FLI DEEP MARINE LLC,** *et al*, | § | |
| Defendant(s). | § | **Judge Isgur** |

## MEMORANDUM OPINION

For the reasons set forth below, the Court grants, in part, and denies, in part, the Liquidating Trustee's Motion for Summary Judgment.

### Background

On December 4, 2009, Deep Marine Holdings, Inc. ("DMH"), Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and Deep Marine 4, LLC (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Prior to the Debtors' bankruptcy filing, two actions (the "Delaware Actions") had been filed in the Delaware Chancery Court against DMH, DMT, and former officers, directors, or shareholders of the Debtors (collectively, the "Delaware Defendants").[1]   The plaintiffs (the

---

[1] On October 26, 2009, Delaware Plaintiffs FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg filed a complaint in the Delaware Chancery Court initiating *FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.*, No. 5020-VCS, which is now pending before Vice Chancellor Strine.

"Delaware Plaintiffs") in the Delaware Actions are former minority shareholders of the Debtors.[2] The Delaware Plaintiffs asserted the following causes of action against one or more of the Delaware Defendants[3]:

1. Breach of fiduciary duty against the officers and directors of the Debtors;

2. Breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

3. Unjust enrichment against allegedly controlling shareholders of the Debtors;

4. Aiding and abetting a breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

5. Aiding and abetting a breach of fiduciary duty against officers and directors of the Debtors;

6. Fraud through active concealment of material facts against all Delaware Defendants;

7. Fraud through silence in the face of a duty to disclose against all Delaware Defendants;

8. Wrongful equity dilution against allegedly controlling shareholders of Debtors.

On January 19, 2010, the Debtors initiated this lawsuit against the Delaware Plaintiffs by filing Debtor's Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (ECF No. 1) .  The Complaint alleges that the Delaware Actions contain derivative claims that are property of the Debtors' estates pursuant to 11 U.S.C. § 541.  Among other things, the Complaint seeks: (i) a declaratory judgment that the

---

On October 30, 2009, Deepwork Inc. filed a complaint initiating *Deepwork Inc. v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.*, No. 5032-VCS, which is also now pending before Vice Chancellor Strine.

[2] The Delaware Plaintiffs were originally shareholders of DMT.  Their DMT shares were allegedly subsequently exchanged for shares in DMH.  For the sake of simplicity, the Court refers to Delaware Plaintiffs as shareholders of DMT throughout this opinion.

[3] The Delaware Plaintiffs also asserted claims for appraisal rights and an accounting against the Debtors.  These claims are not in dispute in this adversary proceeding.

Delaware Actions are property of the Debtors' estates; (ii) a temporary restraining order barring the Delaware Plaintiffs from prosecuting the Delaware Actions until the Court has determined which actions are property of the bankruptcy estates; and (iii) a preliminary and permanent injunction enjoining Delaware Plaintiffs from any act to obtain possession or exercise control over property of the estates.

On January 21, 2010, the Court granted the Debtors' request for a temporary restraining order.  The Temporary Restraining Order (ECF No. 16) provided, in part, that:

> Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, it is ordered that the Defendants, and all persons working in active concert with them, are restrained from prosecuting (i) Case No. 5020-VCS pending in the Court of Chancery of the State of Delaware; (ii) Case No. 5032-VCS pending in the Court of Chancery of the State of Delaware; and (iii) any other lawsuit arising out of the facts and circumstances described in either of the two foregoing lawsuits; provided, this Temporary Restraining Order does not preclude the Defendants from filing any lawsuit that is submitted to and approved for filing by this Court.[4]

On June 2, 2010, the Court confirmed the Debtors' bankruptcy plan, which authorized the sale of substantially all of the Debtors' assets.  The confirmation order transferred all of Debtors' remaining assets to a Liquidating Trust and appointed John Bittner to the position of Liquidating Trustee.  Bittner's duties include, among other things, handling claims owned by the Liquidating Trust.

On February 16, 2011, the Liquidating Trustee filed Plaintiff's Motion for Summary Judgment (ECF No. 133).  The Liquidating Trustee argues that the Delaware Actions primarily allege that some or all of the Delaware Defendants misused corporate funds, engaged in corporate looting, failed to follow corporate formalities, and/or grossly mismanaged the Debtors.

---

[4] The parties subsequently agreed that the Temporary Restraining Order would remain in effect until the Court holds a preliminary injunction hearing.

According to the Liquidating Trustee, the Delaware Actions are, essentially, corporate looting lawsuits.  If that is true, the Delaware Actions would constitute derivative actions belonging solely to the Liquidating Trust.  The Liquidating Trustee requests a permanent injunction containing injunctive language that is nearly identical to the January 21, 2010 Temporary Restraining Order.

On March 16, 2011, one of the Delaware Plaintiffs,[5] FLI Deep Marine LLC ("FLI"), filed the Response of Defendant FLI Deep Marine LLC to Plaintiff's Motion for Summary Judgment (ECF No. 137).  FLI claims that it does not seek to pursue any of the derivative claims that belong to the Liquidating Trustee.  FLI's Response does not attempt to counter the majority of the Liquidating Trustee's arguments in his Motion for Summary Judgment, essentially conceding that most of the underlying claims in the Delaware Actions are derivative.

Instead, FLI requests the Court's permission to file an amended complaint in the Delaware Court of Chancery asserting only three allegedly direct claims (the "Allegedly Direct Claims").  Specifically, FLI's Allegedly Direct Claims are claims against: (i) certain Delaware Defendants designated by FLI as the "Controlling Shareholders"[6] for (a) breach of the fiduciary duty owed by the Controlling Shareholders to FLI and (b) for shareholder oppression; and (ii) Joseph Grano, Jr. for aiding and abetting the Controlling Shareholders' breach of fiduciary duty owed to FLI.  FLI argues that its claims for breach of fiduciary duty, oppression, and aiding and abetting are direct claims because they seek redress for harm inflicted directly upon FLI.

---

[5] Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Deepwork Inc. have not responded to the Liquidating Trustee's Motion for Summary Judgment.

[6] The "Controlling Shareholders" include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr.; (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III; and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy.

**Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[7] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object

---

[7] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact."  *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial.  *Malacara*, 353 F.3d at 403.  Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326.  The non-moving party must cite to specific evidence demonstrating a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  The nonmoving party must also "articulate the manner in which that evidence supports that party's claim."  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).  Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the nonmovant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412.   Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case.  *Celotex*, 477 U.S. at 324.  The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim.  *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

**Issue Presented**

For the purposes of his Motion for Summary Judgment, the Liquidating Trustee stipulates that all facts alleged by the Delaware Plaintiffs in the Delaware Actions are true.  Accordingly, the Court's task is only to determine whether the claims asserted in the Delaware Actions are direct or derivative claims.

**Facts**

The Court summarizes the factual allegations of the Delaware Actions. The allegations are assumed true for the purposes of this Memorandum Opinion.

The Delaware Plaintiffs were early investors in DMT, originally purchasing shares in the company in 2002.  By 2006, the Delaware Plaintiffs' shares of DMT common stock represented more than 8.5% of the company's overall outstanding common stock.  The Delaware Plaintiffs have collectively invested over $1.73 million in DMT.

This is a case primarily about the Controlling Shareholders' alleged usurpation of power over, mismanagement and looting of the Debtors, and the failure of the Debtors' officers and directors to prevent the Controlling Shareholders from doing so.  The Controlling Shareholders include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr. and (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III (collectively "Candies"); and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy.  For the sake of simplicity, any reference to "Kazeminy and Candies" in this Memorandum Opinion should be considered as synonymous with "Controlling Shareholders."

Kazeminy (and companies he owned or controlled) became the majority shareholder of the Debtors.  Candies subsequently gained a significant portion of ownership in the Debtors. Kazeminy and Candies collectively became owners of 90% of the Debtors' outstanding common stock.  Kazeminy and Candies then allegedly used their control over the Debtors and their officers and directors to benefit themselves at the Debtors' and their shareholders expense.

1. **Transactions Between Otto Candies, LLC and DMT—as Alleged in Delaware Complaint**

DMT regularly did business with Otto Candies, LLC which supplied vessels for DMT's subsea projects.  Due to Candies' relationship with Kazeminy and the officers and directors of DMT, the business transactions between Otto Candies, LLC and DMT were often not at arms-length and resulted in DMT incurring substantial losses.

For instance, during 2006, 2007, and 2008, Otto Candies, LLC repeatedly misrepresented the state of its vessels and then charged DMT hundreds of thousands of dollars to lease and charter vessels that were broken, poorly built, or not able to meet U.S. Coast Guard regulations. This forced DMT to pay substantial sums to repair the defective vessels that Otto Candies, LLC had off-loaded onto it.  It also resulted in the loss of valuable contracts with DMT's customers and, consequently, the loss of millions of dollars in revenue.

Otto Candies, LLC also sold vessels to the Debtors at inflated prices.  In May 2007, Candies and Kazeminy caused DMT to pay $6 million above the contracted price to purchase a vessel, later named the Emerald, simply because Candies demanded such amount at the closing of the sale transaction.  In October 2007, DMT purchased the vessels the Agnes and the Sapphire.  The consideration for the purchase was $35 million in DMT stock, although the two vessels were worth no more than $28 million.  This resulted in an overpayment to Candies of at least $7 million.

As in the Agnes and Sapphire transaction, DMT at times paid Candies in convertible debt, instead of cash, for services and vessels.  When Candies converted the DMT debt into DMT common equity, Candies received more DMT shares than it would have received had DMT not overpaid for the assets and services.  This diluted Delaware Plaintiffs' shares and enabled Candies to join Kazeminy as Controlling Shareholders of the Debtors.

### 2.   Improper Payments Made by DMT—as Alleged in Delaware Complaint

Kazeminy's influence over DMT is evidenced by the improper payments that were made at his direction.  First, at Kazeminy's direction, DMT sent three payments of $25,000.00 each to a former United States Senator from Minnesota, Norm Coleman, through an insurance company that employed Senator Coleman's wife.  Kazeminy's relative, Behnaz Ghaufouri, received a $6,000.00 transfer from DMT.  These payments were made despite the fact that neither Coleman nor Ghafouri performed any services for DMT.

### 3.   The Short-Form Merger—as Alleged in Delaware Complaint

On October 10, 2008, after learning of, among other things, Candies' self-dealing and the payments to Senator Coleman, the Delaware Plaintiffs sent a shareholder demand letter to the DMT board of directors.  The Delaware Plaintiffs demanded an investigation into the alleged wrongful conduct.  DMT responded by establishing a special committee to investigate the allegations raised in the demand letter.  According to the Delaware Plaintiffs, this special committee was not independent and failed to conduct a proper investigation.  On June 30, 2009, the special committee released a press statement declaring that it found no wrongdoing over the course of its investigation.

The day after the press statement's release, as part of a scheme to deprive the Delaware Plaintiffs of their standing to bring derivative claims, Kazeminy and Candies commenced and

concluded a Delaware Section 253 short-form merger.  The short-form merger was entered into between the Debtors and NKOC, Inc.[8]  The Delaware Plaintiffs were not notified and did not consent to the merger.

On July 11, 2009, ten days after the merger, the Delaware Plaintiffs were notified of the merger and offered one cent per share for their DMT shares.  Although the company was purportedly valued as worth over $100 million in the 18 months preceding the merger, the notice of merger stated that the company had become so bereft of assets and laden with debt as to be worth nothing at all.  The merger compensation totaled $22,000.00 for all minority shares of DMT.

The short-form merger effectively terminated the Delaware Plaintiffs' ownership in the Debtors and rendered the Controlling Shareholders 100% owners of the Debtors.

### Analysis[9]

A derivative lawsuit is an action that is commenced by a corporation's shareholder on behalf of the corporation for harm allegedly done to the corporation.  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* 845 A.2d 1031, 1036 (Del. 2004).  "Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation."  *Id.*  A shareholder may also bring a direct action for direct injuries to the shareholder's legal rights as a shareholder.  *Id.*  In such direct lawsuits, "the recovery or other relief flows directly to the stockholders, not to the corporation."  *Id.*

---

[8] NKOC is named after the initials of Nasser Kazeminy and Otto Candies.  NCOK was merged into DMH and NCOK's separate corporate existence ceased as of the date of the merger.

[9] The parties agree that Delaware law governs this dispute.  *See also In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) "Under Texas law, actions involving the internal affairs of a foreign corporation are governed by the law of the state of incorporation.") (citations omitted).

In order to determine whether a claim is direct or derivative, the "analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy"? *Id.* at 1035.  Courts must "look to the nature of the wrong and to whom the relief should go." *Id.* at 1039.   In order to have a direct claim, a "stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.*  "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.*

Furthermore, under *Tooley*, "the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." *In re J.P. Morgan Chase & Co.'s S'Holders Litig.*, 906 A.2d 808, 817 (Del. 2005) (internal citation omitted).  "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." *Id.* (internal citation omitted).

The possible derivative and direct causes of action fall into three categories. First are the claims that are clearly derivative, where the shareholder's injury flows directly from harm to the corporation.  As an example, a derivative claim would exist if a corporate executive breaches a fiduciary duty and approves improper financial transactions, resulting in harm to the corporation and a consequent reduction in the value of stock held by shareholders.  The second category is that of clearly direct claims, where the stockholder proves an individualized injury but where the corporation is unharmed as a result.  The third category is where certain shareholders suffer an individualized injury in addition to an injury to the corporation as a whole, which may result in both direct and derivative claims. The Court in *Tooley* stated that "the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail

without showing an injury to the corporation." 845 A.2d at 1039. This does not mean, however, that all shareholder claims are derivative if they result from a transaction injuring both the corporation and shareholders. *See Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) (holding that, under *Tooley*, independent harms to a corporation and to certain shareholders may derive from the same transaction, resulting in direct and derivative claims for the shareholders).

The Court must now analyze each of the Delaware Plaintiffs' claims for the purpose of determining whether they constitute direct or derivative claims. As set forth below, all of the claims except those relating to the allegation of an independent injury (here, equity dilution and expropriation of economic value) are derivative claims.

### 1.   Breach of Fiduciary Duty Against Debtors' Officers and Directors

The Delaware Plaintiffs' first claim at issue is for breach of fiduciary duty against DMT's officers and directors. The Delaware Plaintiffs allege that the actions of DMT's officers and directors, in aiding and approving DMT actions for the private purposes of the Controlling Shareholders, were without merit, served no legitimate business purpose, and were not in the best interests of DMT and/or its shareholders. These actions include gross misuse of corporate funds, self-dealing, equity dilution, failure to follow corporate formalities, and gross mismanagement.

The Liquidating Trustee argues that the Delaware Plaintiffs' breach of fiduciary duty claim against the officers and directors arises out of harm inflicted upon the Debtors, not the minority shareholders. According to the Liquidating Trustee, it was the Debtors' funds that were allegedly misused, the Debtors' opportunities that have been lost because of alleged self-dealing, the Debtors' operations hurt by the alleged failure to follow corporate formalities, and the Debtors' business damaged by the alleged mismanagement.

FLI's Response to the Liquidating Trustee's Motion for Summary Judgment does not contest the Liquidating Trustee's argument on this point.  FLI essentially concedes that the breach of fiduciary duty claim against DMT's officers and directors is a derivative claim.

The Court largely agrees with the Liquidating Trustee that the breach of fiduciary duty claim asserted by the Delaware Plaintiffs against the Debtors' officers and directors is derivative. For example, the harm caused by the officers and directors concerning Candies' allegedly inflated sale prices for Candies' vessels was borne by the Debtors.  The same can be said for the payments allegedly made to Senator Coleman.  Likewise, it is the Debtors who would reap any recovery against Candies for overcharges or Senator Coleman for the $75,000.00 in alleged improper transfers.

The missing link in most of the Delaware Plaintiffs' allegations against the Debtors' officers and directors is an independent injury suffered by the Delaware Plaintiffs.  For instance, there is no doubt that the substantial overpayments allegedly collected by Candies damaged shareholder value by decreasing the Debtors' equity.  But that harm corresponded to the primary injury, the overpayments themselves, which depleted the Debtors' resources.  The decline in shareholder value from overpayments to Candies is not an injury that is independent of any injury to the Debtors.

On the other hand, the Court finds that certain allegations involving equity dilution and expropriation of value must survive the Liquidating Trustee's Motion for Summary Judgment because they contain an independent injury.  A claim of breach of fiduciary duty by corporate officers or directors related to this independent injury is direct.  This relates to the allegation that Candies was, at times, overpaid through the Debtors' issuance of convertible notes in Candies'

favor.  Candies later converted these notes into DMT equity, thereby diluting the Delaware Plaintiffs' ownership stake in the Debtors and expropriating some of its value.

Generally speaking, "claims of overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative."  *Rossette*, 906 A.2d at 99.  However, Delaware law recognizes that one variation of corporate overpayment results in both direct and derivative claims.  This is where "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the  percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 100.  In a normal overpayment situation, "dilution in value of the corporation's stock is merely the unavoidable result . . . of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Id.* at 99.  Therefore in the normal overpayment situation, the stockholders have only a derivative claim.  *Id.*  In the above atypical situation where shares are issued to a controlling shareholder for the purposes of diluting the holdings of minority shareholders, "[a] separate harm also results: an extraction from the [minority] shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.  As a consequence the [minority] shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefitted." *Id.* at 100.   The claim for recovery of the overpayment by the corporation is still, of course, derivative.  *Id.*  However, the minority shareholders also have a direct claim for the expropriation of value from their equity interests that benefitted the majority shareholders. *Id.* This type of situation, in which harm befalls both the corporation and the

minority shareholders, falls into the third category listed above.   It passes the *Tooley* test, because although separate harms to the corporation and the shareholder result from the same transaction, they are independent of one another.   *Id.* at 99.

An important aspect of the situation described in *Rossette* is that the form of overpayment must be stock in order for the dual harms to result.   *Id.* at 100.   However, the issuance of sham convertible notes might inflict similar injury. If the issuance of convertible notes were a sham, intended at the outset to be converted into equity, the Debtors' balance sheet would reflect only a sham liability for the convertible notes.   It would be a temporary, fictitious liability that would evaporate once the conversion was executed.   Just like an issuance of additional shares for no consideration, this would create unique harm to the minority shareholders.   The substance of the Debtors' assets and liabilities would be unaffected from beginning to end, and therefore neither transaction would result in injury to the Debtor.   All of the injury would flow to the allegedly-diluted minority shareholders.

When a worthless (or hyper-valued) asset is obtained for stock (or, for that matter, for sham convertible notes that are the equivalent of stock) issued to majority shareholders, only the minority shareholders would suffer true injury.   Although the corporation might temporarily record the inflated value on its books, marketplace realities would eventually control valuation. When the asset was then reduced to true market value, the only lasting effect would be on the now-diluted minority shareholders. Their ownership percentage in the Debtor would decrease due to the issuance of stock (or the sham conversion). The Debtor's total equity remains unchanged since nothing was paid for the stock, while the minority shareholders' percentage of the Debtor's total equity decreases. This represents a unique and independent injury suffered by the Delaware Plaintiffs. *See In re J.P. Morgan Chase & Co.*, 906 A.2d 808, 818 (Del. Ch. 2005)

(a direct claim exists "where a significant stockholder's interest is increased at the sole expense of the minority") (internal citation omitted).

Accordingly, to the extent that the Delaware Plaintiffs allege an independent injury concerning equity dilution and expropriation of value from their holdings, falling into either the second or third category above, the Liquidating Trustee's Motion for Summary Judgment is denied.   With regard to all remaining allegations, the Court holds that the Delaware Plaintiffs' claim for breach of fiduciary duty against the Debtors' officers and directors is a derivative claim and, therefore, property of the Liquidating Trust.

The Court recognizes that this ruling creates a unique fact issue that must be resolved in ensuing litigation—was the issuance of the convertible debt a sham?  If the convertible debt was legitimately issued, the harm from the issuance of the debt was suffered by the corporation and the minority shareholder's loss would be derivative.  If the issuance of the convertible debt was a sham intended to expropriate value from and dilute the minority shareholders' holdings, then they have suffered a direct injury.  The burden of proof must rest on the minority shareholders to demonstrate any such sham.

## 2. Breach of Fiduciary Duty by the Debtors' Controlling Shareholders

The Delaware Plaintiffs' second claim at issue in the Motion for Summary Judgment is a claim against the Controlling Shareholder Defendants for Breach of Fiduciary Duty.  As with the claim against the Corporate Director's and Officers, the Delaware Plaintiffs allege many illegitimate acts by the Controlling Shareholders, including looting, self-dealing, and unfair dilution of the minority shareholder's interest.  (ECF No. 1, p. 46).

The Liquidating Trustee argues that this "Delaware Cause of Action is clearly focused on harm to the Debtors, and . . . is a derivative claim that belongs to the Trustee." [MSJ, p. 11] The Court agrees with the Liquidating Trustee regarding most but not all of the allegations.

Except as set forth in the next sentence, the breach of fiduciary duty claims against Debtors' Controlling Shareholders are derivative claims. The breach of fiduciary duty claims against Debtors' Controlling Shareholders are direct claims only to the extent that the alleged breach is (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs.

### 3. Unjust Enrichment Against Debtors' Controlling Shareholders

The Delaware Plaintiffs next claim at issue is for Unjust Enrichment Against Debtors' Controlling Shareholders. They allege that the Controlling Shareholders unjustly enriched themselves with DMT's corporate assets, to the detriment of the Plaintiffs. (ECF No. 1, p. 47).

The Liquidating Trustee again alleges that any claims of unjust enrichment are derivative, and therefore property of the Liquidating Trust. The Court agrees with the Liquidating Trustee insofar as the claims relate to corporate looting and generic self-dealing, with the defendants unjustly enriching themselves with DMT's corporate assets. However, a claim of unjust enrichment via expropriation of value from the minority shareholders' DMT holdings, as opposed to unjust enrichment via theft of corporate assets, is direct. The unjust enrichment claims are derivative except as set forth in the next sentence. The unjust enrichment claims are direct claims only to the extent of injuries from (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs..

17

4.   **Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Controlling Shareholders**

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion.  To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

5.   **Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Officers and Directors**

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion.  To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

6.   **Fraud Through Active Concealment Against All Defendants**

The allegations in the Delaware Complaint with respect to this claim relate to efforts by Defendants to shield relevant information about DMT, not to the independent injury allegedly suffered by the Delaware Plaintiffs.  This claim is derivative.

7.   **Fraud Through Silence in the Face of a Duty to Disclose Against All Defendants**

As with the claim of Fraud through Active Concealment, the allegations contained in the Complaint do not relate to the independent injury allegedly suffered by the Delaware Plaintiffs.  This claim is derivative.

8.   **Wrongful Equity Dilution Against Debtors' Controlling Shareholders**

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders.  The Court incorporates the reasoning set forth in that section.

**9.  Shareholder Oppression**

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders.  The Court incorporates the reasoning set forth in that section.

<b>Conclusion</b>

For the above stated reasons, the Liquidating Trustee's Motion for Summary Judgment is granted in part and denied in part.

The Court believes that the reasoning in this Memorandum Opinion fully resolves all matters in dispute between the parties.  Within 14 days, the parties must either (i) set forth any remaining disputes; or (ii) file a proposed final judgment consistent with this opinion.

SIGNED **June 13, 2011.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE